Sam G. **BRODHEAD** et al., Plaintiffs,

v.

**Rainer C. EZELL** et al., Defendants.

**Civ. A. No. 7033–72.**

United States District Court,
S. D. Alabama, S. D.

Aug. 21, 1972.

Hardy B. Smith, J. U. Blacksher, Mobile, Ala., Jack Greenberg, New York City, W. E. Still, Jr., University, Ala., for intervening plaintiffs.

Franklin C. Evans, Butler, Ala., W. A. Kimbrough, Mobile, Ala., Wallace H. Lindsey, III, Butler, Ala., J. R. Bennett, Jr., Birmingham, Ala., for defendants.

## ORDER AND DECREE

PITTMAN, Chief Judge.

This action was commenced by Sam G. Brodhead, Robert Laughlin, Jack DeLoach and Merrill Carlisle, resident citizens of Choctaw County, Alabama, taxpayers and duly qualified and registered voters of said county. The plaintiffs brought the action on their own behalf individually and on behalf of all other qualified electors in Choctaw County, against Rainer C. Ezell, and others as members of the Choctaw County Commission seeking to have the one man one vote principle of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), applied to the election of the members of that county governing body.

Subsequently a Motion to Intervene as plaintiffs was filed by Anthony Butler and Thelma Craig, individually and on behalf of all other qualified black electors residing in Choctaw County. On July 21, 1972, this court entered its order granting the Motion to Intervene and the black electors of Choctaw County appeared by counsel and participated fully in this proceeding as a subclass of the plaintiff class.

In their prayer for relief the plaintiffs ask the court to declare unconstitutional Sections 1 and 2 of Act No. 122, Local Acts of the Alabama Legislature, 1927, page 41, et seq., pertaining to the apportionment of the County Commission of Choctaw County; that the election in 1970 of the commissioners in Districts 2 and 4 be set aside; that the court direct that the County Commissioner of Choctaw County be elected at large and that such at large elections continue until such time as the Legislature of Alabama properly reapportions the membership of the said County Commission in such a manner that the four Commission Districts are as nearly equal in population as may be found practical and constitutional; and for other and further relief.

The intervening plaintiffs adopted the prayer for relief requested by the plaintiffs and further asked that the court order such relief as will protect the interest of subclass and their rights to fair and effective representation.

In their answer the defendants deny the allegations of the complaint wherein it alleges a disparity in the number of qualified electors making up the districts of the Choctaw County Commission and suggest that the burden the plaintiffs have to carry is to show a disparity in populations of the said districts making up the Choctaw County Commission. They further prayed that if the court found the Choctaw County Commission not constitutionally made up, that they be allowed to present a plan for the consideration of the court or in the alternative that if the court reapportions on the basis of registered voters that the court require voter re-identification as a part of

its order. The court's pretrial order required each party to present a plan at trial.

The plaintiffs, Sam G. Brodhead, Robert Laughlin, Jack DeLoach and Merrill Carlisle, are represented by counsel. Intervening plaintiffs, Anthony Butler and Thelma Craig, are represented by counsel. Of the defendants, the members of the County Commission and the Probate Judge of Choctaw County are represented by counsel. The Attorney General of Alabama filed a motion to dismiss as to him which motion was granted. An appearance was made on behalf of the Chairman of the Choctaw County Democratic Party. An appearance was made on behalf of the Alabama State Republican Executive Committee. No other appearances by counsel were made.

## FINDINGS OF FACT

Choctaw County is located in Southwest Alabama. Butler is the county seat and the largest town in the county. A portion of Butler lies in Districts 1 and 2. Other significant communities in the county are Pennington which lies in District 1; Lisman which lies in District 2; Toxey, Gilbertown and Silas in District 3, and Bladon Springs which lies in District 4. Choctaw County is a predominately rural county. Butler, the largest town, has a population of 2,047.

Act No. 122, supra, (hereinafter referred to as Act No. 122) divided the county into four Commissioners districts. The most recent statistical evidence shows the population and number of registered voters in each district as follows:

| | Population | Registered Voters |
|---|---|---|
| District No. 1 (Sparrow) | 5,138 (30.9%) | 3,282 (29.1%) |
| District No. 2 (Ezell) | 4,298 (25.9%) | 2,676 (23.5%) |
| District No. 3 (Doggett) | 4,053 (24.4%) | 3,242 (28.7%) |
| District No. 4 (Moseley) | 3,100 (18.7%) | 2,084 (18.7%) |
| TOTAL: | 16,589 | 11,284 |

The area, in square miles, and the road mileage in each of the Commissioner's districts are shown below:

| | | |
|---|---|---|
| District No. 1 (Sparrow) | 220 | 94.9 |
| District No. 2 (Ezell) | 220 | 118.3 |
| District No. 3 (Doggett) | 240 | 105.8 |
| District No. 4 (Moseley) | 248 | 101.8 |

The Probate Judge is an Ex-Officio member of the Choctaw County Commission, serves as its Chairman, but votes only in the event of a tie.

The said Act requires that each of the Commissioners shall be a qualified elector of the district he represents and that each shall be elected by the qualified electors residing within the district. Each member of the Commission has direct supervision of the construction, repair and maintenance of the public roads and bridges in his district not embraced within the state highway system or under the maintenance of the State Highway Department, except those within the corporate limits of Butler, Pennington, Toxey, Gilbertown and Silas, the incorporated municipalities in the county. In addition, the Commission exercises general governmental powers over all the residents of the county and provides governmental services to the towns and communities in the county. Among its several responsibilities, the County Commission is required to furnish space for elected officials the Register in Equity, the Driver's License Division of the Department of Public Safety, Civil Defense Agency, the V. A. Director, Department of Pensions & Securities, the Food Stamp Program, F.H.A., Selective Service, Department of Education, Extension Service, A.S.C.S. Office, Board of Registrars, Board of Equalization and the Jury Commission. The Commission is obligated to furnish the Sheriff with sufficient deputies, automobiles, and other supplies to maintain peace and harmony. The Commission may appropriate

money for the Food Stamp Program, the Public Library and the Regional Health Program.

The revenue derived by the county is received from residents who live in the towns and communities as well as those who live outside the same.

On the hearing on this cause, the defendant elected officials of Choctaw County proposed a redistricting plan. This plan divides the County into four Commissioner districts. As is required by Act No. 122, to be eligible to run a candidate must reside in the district and be elected by the people of that district. Under this plan District No. 1 would have a total population of 4,167, of whom 822 reside in Butler, a road mileage of 99.7, and 223 square miles; District No. 2 would have a total population of 4,187, of whom 710 reside in Butler, a road mileage of 95.4, and 174 square miles; District No. 3 would have a total population of 4,074, none of whom reside in Butler, a road mileage of 111.2, and 252 square miles; and District No. 4 would have a total population of 4,161, of whom 522 reside in Butler, a road mileage of 114.5, and 279 square miles.[1] The plan contains a map indicating the new lines of the four Commissioner districts.[2] The evidence before the court, including the testimony of each member of the Choctaw County Commission and its Chairman, the Probate Judge, indicates that the proposal of the defendants is a fair and equitable division of the county considering the population, road mileage, total area making up each Commissioner's district, political, social and economic factors, and is nondiscriminatory as to race. To the extent possible, the new plan follows the geographical lines of the old commission districts. Ideally, based on a total population of 16,589, there would be 4,147 persons in each of the districts. Under the proposal of the defendants, District No. 1 is "under-represented" to the extent of 0.48%, District No. 2 is "under-represented" to the ex-

tent of 0.96%, District No. 3 is "over-represented" to the extent of 1.76%, and District No. 4 is "under-represented" to the extent of 0.34%. The result is a variance from absolute equality of 2.72% (113 people).

The Legislature in Act No. 122 provides for staggered terms. The preponderance of the evidence is that staggered terms are preferable. Staggering the terms insures continuity on the board from election to election. Act No. 122 provides that Commissioners for Districts 1 and 3 will be elected in November of 1972, and the election for Commissioners in Districts 2 and 4 will take place in 1974.

Candidates have been nominated by the Democratic party primary to fill the vacancies on the commission that will occur in January, 1973, in Districts 1 and 3. The Republican party did not run candidates for this position. The election of these places will be in November, 1972.

The plan of the defendants does not disturb the positions presently held by the Commissioners in Districts 2 and 4 nor the nomination of candidates for the position of Commissioner in Districts 1 and 3.

## CONCLUSIONS OF LAW

Act No. 122 established a Board of Commissioners which divided Choctaw County into four Commissioner districts as heretobefore shown.

The districts as set up under Act No. 122 are malapportioned, ranging from 5,138 persons in District 1 to 3,100 persons in District 4.

In Midland County, Texas, there was a disparity in the County Commission Court. The Supreme Court said,

"The question now before us is whether the Fourteenth Amendment likewise [concerning representation in a State Legislature in Reynolds v. Sims, infra] forbids the election of local govern-

1. See Appendix A, p. 5. Defendants' Exhibit # 12. [Appendix A has been deleted for purposes of publication.]

2. See ibid.
See Defendants' Exhibit # 1—A map showing old and new lines.

ment officials from districts of disparate population. . . . We hold today only that the Constitution permits no substantial variation from equal population in drawing districts for units of local government having general governmental powers over the entire geographic area served by the body." Avery v. Midland County, 390 U.S. 474, at pages 478 and 484, 88 S.Ct. 1114 at pages 1117 and 1120, 20 L.Ed.2d 45, 48, 51, at pages 50 and 53.

This court finds that those portions of Act No. 122 establishing the four commissioner districts complained of fail to satisfy the requirements of the Equal Protection Clause of the Constitution and are therefore null and void. The Supreme Court of the United States, in a case involving a county commissioner's court, held that it was a unit of local government and must comply with the one man, one vote principle of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964):

> "We . . . see little difference, in terms of application of the Equal Protection Clause and of the principles of Reynolds v. Sims, between the exercise of State powers through legislatures and its exercise by elected officials in the cities, towns and counties. . ."
> Avery v. Midland County, *supra.*

As presently applied Act No. 122 fails to provide the voters "substantially equal weight" in the selection of the commissioners for the several districts in Choctaw County as that term has been defined by the Supreme Court. See Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed. 2d 535 (1969); Wesberry v. Sanders, 376 U.S. 1, 7–8, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

## CHOICE BETWEEN COMPETING PLANS

The parties are in dispute as to the manner of redistricting the county. The thrust of the plaintiffs' complaint, adopted by the intervening plaintiffs, and plaintiffs' evidence produced in support

thereof is based upon a difference in the number of registered voters within each of the four commission districts. In support of this position, the plaintiffs cite the case of Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376.

On the other hand, the defendants and the intervening plaintiffs take the position that redistricting in this case be on the basis of population. In support of their position the defendants cite the case of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) and Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1967). The substance of the decision in Reynolds v. Sims, *supra,* was that bases other than population were not acceptable grounds for distinguishing among citizens when determining the size of districts used to elect members of State Legislatures. The *Midland County* case, *supra,* dealt with a unit of local government, namely a county, which was divided into four commissioner's districts of widely varying populations. The Supreme Court, in a decision written by Justice White, applied the test of population equality to units of local government. At 390 U.S. 484, 88 S.Ct. 1120, 20 L.Ed. 53, the Court said:

> "We hold today only that the Constitution permits no substantial variation from equal population in drawing districts for units of local government having general governmental powers over the entire geographic area served by the body."

The Court reiterated its position on page 485, 88 S.Ct. page 1121, 20 L.Ed. page 54 where it said:

> "Our decision today is only that the Constitution imposes one ground rule for the development of arrangements of local government: a requirement that units with general governmental powers over an entire geographic area not be apportioned among single-member districts of substantially unequal population."

In a more recent decision, Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29

L.Ed.2d 399 (1971), involving a county board of supervisors in New York, the Court 403 U.S. at page 185, 91 S.Ct. at page 1906, 29 L.Ed.2d at page 402 said:

" 'Mathematical exactness or precision is hardly a workable constitutional requirement.' Reynolds v. Sims, (citation omitted) but deviations from population equality must be justified by legitimate state considerations, Swann v. Adams, 385 U.S. 440, 444, 87 S.Ct. 569, 572, 17 L.Ed.2d 501, 504 (1966)."

The plaintiffs seek to have the court declare (1) as unconstitutional the subdivision of Choctaw County into its present four county Commissioner districts; and, (2) there is no constitutionally valid reason of the subdivision of the county into Commissioner districts; and, (3) that the two districts up for election in the general election, Districts 1 and 3, be held on an at-large basis in the general election of November, 1972; and, (4) that the two Commission officers, to wit, Districts 1 and 4, which are elected on a staggered basis and are up for election in 1974, be held at that time on an at-large basis.

The plaintiff intervenors, a class action representing the black electors of Choctaw County, have submitted a plan.[3] The plan divides the county into four Commissioner districts with each Commissioner being required to live in the district and be elected by the district. The plan's district lines disregard the traditional district lines which have been in effect in the county since 1875. The population of the county is 56.1% white and 43.9% black. The predominant area of black population is in the northern one-third of the county. Under the existing County Commissioner district lines in this area, one district, to wit, District 1, has 57.7% white and 42.3% black, and the other district, to wit, District 2, has 31.4% white and 68.6% black.

The plaintiff intervenors' plan has placed the vast majority of the black population in one district, to wit, the nothern district, giving it a 77.3% black with a 22.7% white population. A portion of this northern district is included in the plaintiff intervenors' eastern district which has a 57.5% white population and 42.5% black population.[4]

The defendants proposed plan closely follows the traditional district lines of almost 100 years and was apparently districted without racial purpose. In this portion of the county which has the county's heaviest black concentration, the defendants' proposed plan, to wit, District 1, has 46.5% white against 53.5% black and District 2 will have 38.3% white against 61.7% black. This makes two of the four districts constituted with a majority of the population black.

There seems to be two predominant factors in the plaintiff intervenors' plan, to wit, equal population in the four districts and drawing the district lines in such a way as to heavily weight one district with black population with open argument it should be so constituted to insure the election of a black person. Little consideration was given to other economic, social, and political factors which the county governing board is faced in discharging its duties.

Under the present district plan some confusion has arisen from five voting boxes being in two different districts, four boxes in District 2 and one box in District 4, which have been referred to as split boxes. The plaintiff intervenors' plan would create 20 split boxes located throughout the county in nine of the twelve beats. In the present plan, all split boxes are in one beat. In the defendants' proposed plan there would be

---

3. See map submitted with the plan, Appendix B. [Appendix B has been deleted for purposes of publication.]

4. Intervenors Plan

Four Districts: Northern, Eastern, Western, Southern

| | Population | | Race | |
|---|---|---|---|---|
| | | | W | B |
| N | 4,093 | 24.7 | 22.7 | 77.3 |
| E | 4,209 | 25.4 | 57.5 | 42.5 |
| W | 4,205 | 25.4 | 76.0 | 24.0 |
| S | 4,082 | 24.6 | 67.5 | 32.5 |

Maximum variance .8%

six split boxes, but they are so located that with minimum effort and expense the split boxes can be remedied by creating three new district polling boxes. Because of the location of the split boxes under the plaintiff intervenors' plan, the same type remedy would be much more difficult to accomplish incurring greater expense and voter inconvenience.

■ The plaintiff intervenors' plan is "gerrymandering" to create a predominantly black district for the stated purpose of electing a black official. This is as constitutionally impermissible as to split the black vote into different districts so they have a minority population to prevent the election of black officials.

■ The plaintiffs' plan of electing the Commissioners at large is constitutionally impermissible for the same reason which would accomplish the opposite result. The practical effect would be to reduce and probably nullify the black population's chances of electing a black official since the county as a whole has a white majority, whereas under the present plan, the blacks have a majority in one district and under the defendants' proposed plan the blacks have a majority in two districts.

■ When United States District Courts are forced to fashion apportionment plans, single-member districts are preferable to large multi-member districts as a general matter. Connor v. Johnson, 402 U.S. 690, 692, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971). While multi-member districts are not *per se* violative of the Constitution, Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), they are impermissible when they operate to minimize or cancel out the voting strength of racial or political minorities, Fortson v. Dorsey, 379 U.S. 433, 439, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed. 2d 376 (1966).

The Supreme Court has dealt with the question of multi-member districts in several cases, each one of which was concerned with a state legislature. *Connor,* *supra*; *Whitcomb, supra*; *Fortson, supra*; *Burns, supra*. In this case the court must deal with the concept of one multi-member district covering the entire electorate for the governmental body. The court believes and holds this to be a significant difference from the cited cases.

In addition, the Supreme Court has recognized that an "invidious effect can . . . be shown . . . if districts are not appropriately subdistricted to assure distribution of legislators that are resident over the entire district," Burns v. Richardson, *supra*, 384 U.S. at 88, 86 S.Ct. at 1294. An at-large election in Choctaw County could cause exactly such a problem.

■ Finally, the State Legislature has chosen, through inaction, to leave the Choctaw County Commission elected on a district, rather than at-large, basis. The decree of this court will leave that judgment undisturbed, however modified to fit the requirements of the Fourteenth Amendment.

■ This court, in another case, did not attempt redistricting because "political factors which should not be entrusted to the judiciary" must be considered, and simply voided the law dividing the county into districts and ordered at-large districts and retained jurisdiction until the Legislature apportioned the county in an acceptable manner. [Reynolds v. Gallion, ex rel. Attorney General of Alabama, 308 F.Supp. 803, 805–806, (M.D.Ala.1969)]. The case sub judice is distinguishable from that case in that in the *Reynolds* case, (1) there was a paucity of evidence before the court of the economic, social, and political factors; (2) the court was not faced with a white-black discrimination factor as in this case, and (3) the plans submitted to the court were unsatisfactory. The plans presented in this case are more comprehensive and supported by much more evidence, therefore, withholding a decree until the Legislature acts would serve no valid objective.

"In Alabama it is reasonable to conclude that multi-member districts tend to discriminate against the black population." Sims v. Amos, 336 F.Supp. 924, 936 (M.D.Ala.1972) (three-judge court). Until August 8, 1972, there had never been an elected black official in Choctaw County. On that date one black was elected to public office in the town of Silas. The evidence before the court reflects a pattern of polarized voting among the blacks and whites. So long as the present polarization continues, the blacks are not likely to be elected in elections where they are outnumbered. To order the County Commissioners to run at-large would effectively deny the sizeable black minority a political voice. For this reason, the court is compelled to order that there be districts of substantially equal size for the election of County Commissioners.

■ The court finds that the plan proposed by the defendants based on the population of each district is an appropriate plan for the redistricting of Choctaw County. This plan provides the voter "substantially equal weight" in the selection of the commissioners who make up the Commission and comports with the requirements of the Equal Protection Clause of the United States Constitution. Reynolds v. Sims, *supra,* and Avery v. Midland County, *supra.*

The case relied upon by the plaintiffs, Burns v. Richardson, *supra,* dealt with the constitutionality of Hawaii's Legislative apportionment. In *Burns* the court had before it a unique situation, the State of Hawaii. There was evidence of record of "special population problems", that a reapportionment plan based solely upon population was distorted because of the uneven distribution of a large number of military residents and a large tourist population who continually flow in and out of the state and who "for census purposes are initially at least, counted as part of Hawaii's census population." Going further the Court said:

"Total population figures may thus constitute a substantially distorted reflec-

tion of the distribution of state citizenry. If so, a finding that registered voters distribution does not approximate total population distribution is insufficient to establish constitutional deficiency. It is enough if it appears that the distribution of registered voters approximates distribution of state citizens or another permissible population base." (384 U.S. at page 94, 86 S.Ct. at page 1298, 16 L.Ed.2d at page 392)

In commenting on the use of registered voters as a basis for reapportionment, the Court at 384 U.S. 92, 86 S.Ct. 1297, 16 L.Ed.2d 391 said:

"Use of a registered voter or actual voter basis presents an additional problem. Such a basis depends not only upon criteria such as governs state citizenship, but also upon the extent of political activity of those eligible to register and vote. Each is thus susceptible to improper influences by which those in political power might be able to perpetuate underrepresentation of groups constitutionally entitled to participate in the electorial process, or perpetuate a 'ghost of prior malapportionment.' Moreover, 'fluctuations in the number of registered voters in a given election may be sudden and substantial, caused by such fortuitous factors as a peculiarly controversial election issue, a particularly popular candidate, or even weather conditions.' Ellis v. Mayor and City Council of Baltimore, 352 F.2d 123, 130 (CA 4th Cir. 1965). Such effects must be particularly a matter of concern where, as in the case of Hawaii apportionment, registration figures derived from a single election are made controlling for as long as 10 years. In view of these considerations, we hold that the present apportionment satisfies the Equal Protection Clause only because on this record it was found to have produced a distribution of legislators not substantially different from that which would have resulted from the use of a permissible population basis."

The "special population problems" of Hawaii have not been shown to be present in Choctaw County, Alabama.

The Supreme Court has intentionally refused to fix a numerical or percentage population variance small enough to be considered de minimis and to satisfy without question the "as nearly as practicable standard" enunciated in Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). The plan proposed by the defendants achieving a variance from equality of only 2.72% comports with the requirements of the Constitution. On this question of mathematical equality a Three Judge District Court sitting in Louisiana in an opinion written by Judge Wisdom said:

> "Mathematical exactitude is not a constitutional requirement. Each voting district need not have precisely the same number of individuals per elected representative. The districts created must, however, come as close to the ideal of equality of voting strength as is practicable. Deviations will be allowed only if the plan constitutes a good faith effort to reach that ideal." Bannister v. Davis, D.C., 263 F.Supp. 202, 206 (1966).

The plan presented by the defendants is close enough to the "ideal" and is approved by this court.

 This court is further persuaded from the evidence that the staggering of terms in each of the districts as proposed is desirable and in keeping with the spirit of the expression on this by the Legislature of Alabama in Act No. 122.

## REMEDY

It is ordered, adjudged and decreed that the following portions of Act No. 122 [5] are unconstitutional and void, to wit,

> "The said Districts shall bear the same numbers as the Board of Revenue Districts heretofore established and now existing and shall each be composed of that part of said County embraced within the Board of Revenue District of corresponding number."

It is further ordered, adjudged and decreed that the defendants' reapportionment plan of four districts is hereby adopted by the court and shall be in accordance with defendants' Exhibit #12 as shown by the map attached thereto and the districts as more particularly described on pages 6 to 10 inclusive.[6]

Inasmuch as the court has retained the staggered plan, the court conceives it to be more equitable to permit Commissioners in Districts 2 and 4, elected in 1970, to continue to hold their offices as elected. The terms will expire in 1974, and the officials will be up for election in 1974. The complaint in this case was filed February 25, 1972. The laws of Alabama require that candidates for the Democratic Primary qualify on or before March 1.[7] The primary for Democrats and Republicans was held in May. The case was filed too late for this matter to be properly adjudicated in time for qualification, campaign, and election in the primary for the nomination of the Democratic and Republican candidates for the November general election. There was more than one candidate for each of the two districts in the Democratic primary. There were no candidates in the Republican primary. The districts up for election in November, 1972, are Districts 1 and 3.

Under the present district arrangement population in District 3 is 4,053; the white population 69%; the black population 31%; the road mileage 25.1% of the total; and the area 25.9% of the total. Under the defendants' plan adopted by this court, the population will be 4,074, the white population will be 69.3% and the black population will be 30.7%. The road mileage will be 26.4% of the total, and the area 27.1% of the total. There is a minimal variation in the dis-

---

5. See Exhibit A attached to the Complaint.

6. See Appendix B, Defendants' Exhibit #12.

7. Alabama Code, Title 17, Section 348.

trict lines under the present arrangement and under the adopted plan. Independents and other parties which do not use a primary for nomination more than likely can get candidates on the November election ballot. The court holds that under these circumstances, the winner of the November general election for District 3 will hold office for a full four year term.

As to District 1, under the present arrangement it has a population of 5,138 or 31% of the total, with 57.7% white and 42.3% black; 22.6% of the county's road mileage, and constituting 23.7% of the county total area. Under the plan adopted, the district will have 4,167 population or 25.1% of the total, with 46.5% white and 53.5% black, with 23.7% of the county's road mileage and constituting 24.0% of the county area. It is not practical to order a special primary election between now and the general election. Candidates as Independents or representing parties other than the Republican or Democratic can likely get names placed on the general election ballot. Due to the substantial change in population for the district, and the substantial change in the white/black makeup of the district, it is ordered by the court that the winner for District 1 serve only two of the four years and that the Commissioner for District 1 be elected for the remaining two years of the four year term in the general election in 1974.

The candidates for District 1 and District 3 are to be voted on by voters in the Districts 1 and 3 in the new plan herein adopted.

It is the further order, judgment and decree that Mark Ezell as Probate Judge of Choctaw County shall supply each polling place in the county, created by this decree or the boundaries of which are changed by this decree, in the general election, November 7, 1972, with accurate maps of the county showing the new election districts; and that each voter shall place after his or her signature on duplicate copies of the poll lists of said polling places a designation to indicate the commission district of that voter's residence; and that Judge Ezell and the Choctaw County Commission or other proper authorities shall also provide such separate polling boxes, poll officials and other supplies as may be necessary to allow qualified electors to vote in their respective commission district races and no other.

It is the further order, judgment and decree of the court that the Probate Judge use one of said duplicate copies of the poll lists mentioned above for use in correcting the records as to the residence of electors.

It is further ordered, adjudged and decreed that polling boxes be established to eliminate polling boxes in which qualified electors may vote in one or the other of two commissioners' districts (hereinbefore referred to as split boxes). To accomplish this end the Probate Judge of Choctaw County and the Choctaw County Commission are to take appropriate joint steps to prepare a new list of qualified electors of Choctaw County in accordance with the new polling boxes.

To further implement the plan adopted by this court, it is ordered, adjudged and decreed that the Choctaw County Commission shall provide a new polling box at or near the junction of County Highway No. 9 and County Highway No. 32 for the convenience of those electors living east of the new district line between Commission Districts 1 and 2 and north of Tuckabum Creek;

That the Choctaw County Commission shall create three (3) District polling boxes for those qualified electors who cast ballots in the Town of Butler and said boxes shall be located at the National Guard Armory in the Town of Butler. Said polling boxes shall be divided alphabetically by the Choctaw County Commission so that they contain the number of qualified electors required by Alabama law. These polling boxes shall be designated as follows:

Box District 1
Box District 2
Box District 4

The qualified electors who previously resided in the Butler boxes in District 2, but under the plan adopted by this court now reside in District 1 shall be placed on the qualified voter's list in the newly created Box District 1.

The qualified electors who reside in the Butler boxes in the newly created District 2 shall be placed on a qualified voter's list in polling Box District 2.

The qualified electors who reside in the Butler boxes in the newly created District 4 shall be placed on the qualified voter's list for polling Box District 4.

The qualified electors living north of the new district line between Districts 1 and 4, who previously voted at Mt. Sterling, shall vote in Butler Box District 1 or in the Lavaca box.

Those qualified electors who reside south of Tuckabum Creek and east of the newly created district line between Districts 1 and 2 shall vote in the Butler polling Box District 1.

The qualified electors who live east of the new district line between Districts 3 and 4 and who formerly voted at the Cullomburg box shall vote at the Bladon Springs Box.

The qualified electors living south of the new district line between Districts 2 and 3 shall vote at the Bogueloosa voting box.

It is the further order, judgment, and decree of the court that all defendants, together with their agents, servants, employees, successors in office and all others in active concert or participation with them, or any of them, shall be and hereby are enjoined until the further order of this court from failing to implement this decree as herein ordered and are further enjoined to refrain from holding or obstructing any person ordered to do specific acts by this decree.

It is the further order, judgment and decree of the court that the defendants are taxed with the costs.