Wylie C. **YELVERTON** et al.,
Plaintiffs,

v.

Roy **DRIGGERS**, Individually, et al.,
Defendants.

Civ. A. No. 1305–S.

United States District Court,
M. D. Alabama, S. D.

Feb. 7, 1974.

Howard A. Mandell, Montgomery, Ala., for the plaintiffs.

William G. Hause, Hardwick, Hause & Segrest, Dothan, Ala., and Oakley Melton, Jr., and Joseph C. Espy, III, Montgomery, Ala., for the defendants.

## OPINION

JOHNSON, Chief Judge.

Plaintiffs,[1] individually and on behalf of the class which they represent,[2] brought suit in this Court[3] asserting that a reapportionment plan for the City of Dothan, Alabama,[4] was unconstitutional on account of the effects and operation of those facets of the plan involving numerical apportionment and multi-member districting. Plaintiffs claim that their constitutional rights under the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution have been violated. Jurisdiction in this Court is predicated upon 28 U.S.C. §§ 1331, 1343(3)–(4), 2201 and 2202, and suit is brought pursuant to 42 U.S.C. § 1983.

### I. Malapportionment

It has been clear for more than a decade that the United States Constitution requires that political representation must be equally apportioned on the basis of population. States must make "an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable." Mahan v. Howell, 410 U.S. 315, 324, 93 S.Ct. 979, 985, 35 L.Ed.2d 320 (1973). However, in reapportionment cases as in other civil cases, plaintiffs must present a prima facie case if they are to prevail on the merits. White v. Regester, 412 U.S. 755, 764, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); Gaffney v. Cummings, 412 U.S. 735, 741, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973).

---

1. As originally filed, this suit was prosecuted by several named plaintiffs, individually and as members of a class [see note 2, *infra*]. On October 31, 1973, plaintiffs moved to strike all named plaintiffs except Wylie C. Yelverton. On January 16, 1974, this Court granted leave to plaintiff to amend his complaint to add several new named plaintiffs. This amendment did not in any way change the issues of this lawsuit or prejudice defendants. See the order entered by this Court on January 21, 1974, in this case.

2. The named plaintiffs sue as representatives of the class of black residents and voters in the City of Dothan, Alabama. On January 21, 1974, this Court held that the action was a properly maintainable class action under Fed.R.Civ.P. 23(b)(2).

3. A three-judge district court was originally convened in this cause to decide a feature of this case involving compliance with the Voting Rights Act of 1965, specifically § 5 thereof, 42 U.S.C. § 1973c. A three-judge court was mandated by statute for consideration of that portion of this litigation. Allen v. Bd. of Elections, 393 U.S. 544, 563, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); United States v. Cohan, 470 F.2d 503, 505 (5th Cir. 1972); Wilson v. Bd. of Elections, 317 F. Supp. 1299, 1301 (M.D.N.C.1970). That is-

sue was mooted when the Department of Justice gave its expedited approval to the statutes here in question. A three-judge court is not necessary to decide the remaining issues in this litigation. Act 211, under attack here, is a local law, and thus is not a law of statewide application so as to require the convocation of a three-judge court. 28 U.S.C. § 2281. Act 2141, also under attack here, purports to be a statewide act applicable to cities in certain population classes only; such an act is styled a "general act of local application," since it is in fact applicable only to one city. A three-judge court need not be convened to consider the constitutionality of such an act. Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967).

4. Plaintiffs attack Act 2141 of the 1971 Legislative Session of Alabama upon the ground that its requirement of at-large voting in City Council elections impermissibly dilutes the voting strength of blacks in Dothan. Plaintiffs also allege that Act 211 of the 1973 Legislative Session of Alabama, which delineates the boundaries of voting wards in Dothan, creates numerically malapportioned voting wards, in violation of the one man-one vote requirement of the Fourteenth Amendment.

Plaintiffs in this case seek to establish their case on the malapportionment issue by showing a disparity between the number of *registered voters* in the several wards of the City of Dothan. Plaintiffs have introduced no population figures showing racial distribution in the Dothan City wards, except old census data from 1930 and 1940. Thirty-year-old census data is, for present-day cases, an inherently unreliable and misleading data source. No prima facie case of malapportionment can be premised upon population data three decades old.

▪ Furthermore, it is clear that in this case this Court may not properly base its consideration of the malapportionment issue upon registered voter statistics. Data based upon factors other than mere population may be used only if they yield a distribution of legislators not substantially different from that produced by use of population figures. Burns v. Richardson, 384 U.S. 73, 92, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); Zimmer v. McKeithen, 485 F.2d 1297, 1303 n.11 (5th Cir. 1972) (en banc); Brodhead v. Ezell, 348 F.Supp. 1244, 1251–1252 (S.D.Ala.1972). It is evident that the use of registered voter statistics as a base for the one man-one vote portion of this case would result in a pattern wildly disproportionate to the population. Plaintiffs point out in their brief that only 43 percent of Dothan's age-eligible blacks are registered voters, as compared with 72 percent of the age-eligible whites in Dothan. Here, population statistics must be used.

At the close of plaintiffs' evidence, defendants moved for a directed verdict upon the apportionment issue, for failure by plaintiffs to prove a prima facie case of malapportionment. Since plaintiffs did not introduce evidence containing viable and recent population figures in the Dothan wards, a prima facie case of malapportionment has not been established. Therefore, defendants' motion for directed verdict on the malapportionment issue will be granted.

## II. *Multi-Member Districting*

A multi-member district is any single electoral district from which more than one political representative is elected. It is clear that a multi-member district is not *per se* unconstitutional. Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). Nevertheless, multi-member districts may at times result in the submersion of a minority element within the district in some instances in which that minority, in a single district situation, would ordinarily be expected to be able to elect representation. Therefore, when a federal court draws a reapportionment plan, "single-member districts are preferable to large multi-member districts as a general matter." Connor v. Johnson, 402 U.S. 690, 692, 91 S.Ct. 1760, 1762, 29 L.Ed.2d 268 (1971). Even federal courts, however, are free to adopt multi-member district plans in certain highly unusual situations. See Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973).

When a state adopts a multi-member districting plan, the plan may be

> subject to challenge where the circumstances of a particular case may 'operate to minimize or cancel out the voting strength of racial or political elements of the voting population.'

Whitcomb v. Chavis, 403 U.S. 124, 143, 91 S.Ct. 1858, 1869, 29 L.Ed.2d 363 (1971). The challenger must carry the burden of proving dilution or cancellation of the voting strength of a racial or political minority. *Id.* at 144, 91 S.Ct. 1858. This may be accomplished by proving that the members of the minority in question have less opportunity than do other residents "to participate in the political process and to elect legislators of their choice." White v. Regester, 412 U.S. 755, 766, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973); Turner v. McKeithen, 490 F.2d 191, 194 (5th Cir. 1973); Zimmer v. McKeithen, 485 F.2d 1297, 1305 (5th Cir. 1973) (en banc).

■ Several factors have been pointed out by courts as factors which may be indicia[5] that a multi-member district system operates to minimize or cancel the voting power of a minority.

First, plaintiff must show that "the political processes leading to nomination and election were not equally open to participation by the group in question . . . ." White v. Regester, 412 U.S. 755, 766, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973). *Accord,* Turner v. McKeithen, 490 F.2d 191 (5th Cir. 1973); Zimmer v. McKeithen, 485 F.2d 1297, 1305 (5th Cir. 1973) (en banc). This lack of openness of the political processes may be shown to exist in a system which gives blacks little power in the selection of candidates, even if it seeks their vote at the general election. Turner v. McKeithen, 490 F.2d 191, 194 (5th Cir. 1973). Lack of openness is also strongly indicated by the fact that no blacks have ever been elected before. *Id.* at 195. Even if blacks had been nominated or had run, if the interests which supported their election did not "exhibit good faith concern for the political and other needs and aspirations of the Negro community," the presence on the ticket of such token blacks may be discounted as an indicium of political openness. White v. Regester, 412 U.S. 755, 767, 93 S.Ct. 2342, 37 L.Ed.2d 314 (1973). While election of a black is some evidence of political openness and access, it is certainly not conclusive on the issue:

> Such success might, on occasion, be attributable to the work of politicians, who, apprehending that the support of a black candidate would be politically expedient, campaign to insure his election. Or such success might be attributable to political support motivated by different considerations—namely that election of a black candidate will thwart successful challenges to electoral schemes on dilution grounds.

In either situation, a candidate could be elected despite the relative political backwardness of black residents in the electoral district. Zimmer v. McKeithen, 485 F.2d 1297, 1307 (5th Cir. 1973) (en banc).

Second, a history of racial discrimination is a factor tending to indicate dilution of the political power of a racial minority. White v. Regester, 412 U.S. 755, 766, 93 S.Ct. 2342, 37 L.Ed.2d 314 (1973). The history of racial discrimination is especially instructive on this point if it "touched the right of Negroes to register and vote and to participate in the democratic processes." *Id.* at 766, 93 S.Ct. at 1339. Racially discriminatory facets of evidentiary weight include (a) formerly segregated schools, Turner v. MeKeithen, 490 F.2d 191, 194 (5th Cir. 1973); Zimmer v. McKeithen, 485 F.2d 1297, 1306 (5th Cir. 1973) (en banc), (b) state-required literacy tests, Turner v. McKeithen, 490 F.2d 191, 194 (5th Cir. 1973), (c) complete lack of registered black voters during some past period, Zimmer v. McKeithen, 485 F.2d 1297, 1306 (5th Cir. 1973) (en banc), (d) the past necessity for the presence of federal voting registrars, Turner v. McKeithen, 490 F.2d 191, 195 (5th Cir. 1973), (e) statistics showing that more black voting registrants registered with the federal voting registrars than with the state registrars in a comparable period, Turner v. McKeithen, 490 F.2d 191, 195 (5th Cir. 1973), and (f) statistics showing a larger percentage of registered white voters than black voters, in proportion to their population in the community. Turner v. McKeithen, 490 F.2d 191, 195 (5th Cir. 1973); Zimmer v. McKeithen, 485 F.2d 1297, 1306 (5th Cir. 1973) (en banc).

Third, one factor showing that the political power of blacks has been diluted is a past lack of responsiveness by the governmental entity to black needs and aspirations. Turner v. McKeithen, 490

---

5. "The fact of dilution is established upon proof of the existence of an aggregate of these factors . . . [A]ll these factors need not be proved . . . to obtain relief." Zimmer v. McKeithen, 485 F.2d 1297, 1305 (5th Cir. 1973) (en banc).

F.2d 191, 194 (5th Cir. 1973); Zimmer v. McKeithen, 485 F.2d 1297, 1305 (5th Cir. 1973) (en banc).

A fourth factor indicating dilution of minority political power is the existence of a state policy generally in favor of single-member districts, indicating that the use of multi-member districts is an infrequent occurrence. Zimmer v. McKeithen, 485 F.2d 1297, 1307 (5th Cir. 1973) (en banc).

Where the existence of these four factors can be demonstrated, "a strong case is made," Zimmer v. McKeithen, 485 F.2d 1297, 1305 (5th Cir. 1973) (en banc), although the existence of all need not be proved. *Id.* Over and above these factors, there may be several extraordinary indicia which enhance proof of minority dilution. One enhancing factor is *lack* of a provision requiring at-large candidates to reside in particular geographic subdistricts. Whitcomb v. Chavis, 403 U.S. 124, 143–144, 91 S. Ct. 1858, 29 L.Ed.2d 363 (1971); Turner v. McKeithen, 490 F.2d 191, 196 (5th Cir. 1973); Zimmer v. McKeithen, 485 F.2d 1297, 1305 (5th Cir. 1973) (en banc); Graves v. Barnes, 343 F.Supp. 704, 725 (W.D.Tex.1972), aff'd sub nom. White v. Regester, 412 U.S. 755, 93 S.Ct. 2342, 37 L.Ed.2d 314 (1973). Other enhancing factors may be recent use of racial campaign tactics, White v. Regester, 412 U.S. 755, 767, 93 S.Ct. 2342, 37 L. Ed.2d 314 (1973), or an especially large district, Zimmer v. McKeithen, 485 F.2d 1297, 1305 (5th Cir. 1973) (en banc). Still other extraordinary and enhancing factors may involve unusual voting and political procedures such as a "place" rule, anti-singleshot voting, or majority vote rule. White v. Regester, 412 U.S. 755, 766–767, 93 S.Ct. 2342, 37 L.Ed.2d 314 (1973); Turner v. McKeithen, 490 F.2d 191, 196 (5th Cir. 1973); Zimmer v. McKeithen, 485 F.2d 1297, 1306 (5th Cir. 1973) (en banc).

Both plaintiffs and defendants at trial adduced substantial oral and documentary testimony upon these several factors and indicia. On the basis of the oral and documentary evidence, this Court makes findings of fact as follows.

A. *Lack of Openness of the Political Process.* This Court of course takes judicial notice of the laws of the state in which it sits. One of those laws is the Alabama Constitution of 1901, which instituted extensive suffrage requirements still in force to some degree. A scholarly analysis of the debates and proceedings of the Alabama Constitutional Convention of 1901 concludes that removal of blacks from the political process was the chief purpose of that constitutional convention. M. McMillan, Constitutional Development in Alabama 268 (1955). This Court also takes judicial notice of prior cases in this Court which established that legal impediments to black political participation in Alabama were abandoned, if at all, only after extensive litigation in the federal courts. See *e. g.,* United States v. State of Alabama, 252 F.Supp. 95 (M.D.Ala. 1965); United States v. Alabama, 192 F.Supp. 677 (M.D.Ala.1961).

With regard to the particular situation in Dothan, this Court finds that blacks were long excluded from the political process. Evidence adduced at trial showed that in 1945 only three blacks were registered to vote in Dothan, and there are indications that they did not vote. Testimony from Dothan black men, active in the local voting rights effort for almost thirty years, pointed out the extensive and pervasive exclusion of Dothan blacks from every phase of the local political process. The evidence conclusively reflected that blacks in Dothan remain substantially outside the political process. Very few blacks, and those only very recently, have been appointed to the various boards and commissions of city government. Blacks are also substantially excluded from employment in the city government of Dothan. The evidence shows that few blacks hold city jobs and those who do are, by and large, custodial employees or employees in arms of government which serve blacks exclusively (*e. g.,* in the black recreation center). The

various organs of the local Democratic Party have long been all white or substantially all white. In the last election, held since this suit was filed, a black candidate was elected to the Dothan City Council. While election of a black candidate may portend increasing black access to the political process in the City of Dothan, applicable law indicates that election of a black is not conclusive on the issue of black political access. The Court of Appeals for this Circuit has noted that election of a black may be in some cases planned to "thwart successful challenges to electoral schemes on dilution grounds." Zimmer v. McKeithen, 485 F.2d 1297, 1307 (5th Cir. 1973) (en banc). While this Court makes no finding on the factors which caused whites to vote for this black candidate, evidence introduced shows that printed campaign material used in that election suggests that this litigation, already instituted, should not be completely excluded as a possible factor influencing white voters to vote for the black candidate.[6] Hard, factual evidence necessitates the conclusion that blacks have been, and still are, excluded in substantial measure from political activity in the City of Dothan.

B. *History of Racial Discrimination.* In addition to the racial discrimination noted above, there has been and still remains substantial and pervasive racial discrimination in Dothan. The evidence shows that housing in Dothan is almost entirely segregated along racial lines. Blacks and whites have separate and segregated city recreation centers and Boys' Clubs. Governmental services, as shown by the evidence at trial, have been noticeably neglected in the black areas of town. The few black policemen on the police force patrol only black areas. Schools were entirely or substantially segregated until litigation in this Court. And, employment in city jobs,

above menial levels, is almost entirely limited to whites. The evidence strongly supports the conclusion of this Court that there is and has been substantial racial discrimination on almost all levels in Dothan.

C. *Past Lack of Governmental Responsiveness to Needs of Black Community.* Much of the evidence noted above indicates a history of lack of responsiveness to black community needs and goals by the government of the City of Dothan. The evidence clearly shows that governmental services have been disproportionately bad in the black areas. The city recreation center in the black area is worse than the one in the white area. Blacks were until very recently repeatedly rebuffed in their efforts to gain black representation on vitally important committees and boards of city government. A system of segregated schools was operated until the recent past and was modified only after litigation in this Court. On the basis of these factors, this Court finds that the government of the City of Dothan has, in the past, evidenced a clear lack of responsiveness to the physical needs of its black citizens.

D. *State Policy on Multi-Member Districting.* On the city level, there cannot be said to be any fixed policy in the State of Alabama regarding single or multi-member districting. Both systems are used. See Ala.Code, tit. 37, §§ 404, 426 (Supp.1971). From approximately the turn of the century until 1935, the City of Dothan had an aldermanic form of government with aldermen elected from individual wards. Act 319, Acts of Alabama, 1896–97 at 787. From 1935 to 1960, the city had a three-man council elected at large. Act 409, Acts of Alabama, 1935, at 879. From 1961 to 1973, it is conceded that the city government of Dothan was also elected at

6. Campaign advertising printed in the *Dothan Eagle* (a daily paper in Dothan) by one candidate for office in the last race for the city council contains references to propaganda suggesting that "if a black is not elected City Commissioner the Federal Court will

appoint one." This evidence was of course admitted only upon the point that it was printed and distributed, but certain inferences may permissibly be drawn from that fact alone.

large. Hence, the policy of the State of Alabama cannot be said to have been definitely in favor of either single or multi-member districts. The ambivalent state policy in this regard must be considered as a neutral factor in our consideration.

E. *Additional Factors.* There are additional indicia of racial dilution in this case. The evidence shows that there were formerly in Dothan a "place" requirement and a majority vote provision, under the form of government used in Dothan until 1971. Both of these factors enhance proof of racial dilution.

The present election system in Dothan requires candidates to *reside in* certain wards although the candidates are elected citywide. A residence requirement does, in some measure, reduce the dilution of minority political power by requiring a geographic spread of candidates. However, such a requirement does no more than reduce, minimally, the racial dilution effect of a multi-member districting system. While that reduction is salutary, its effect may easily be negated by the fact that the majority of the voters ultimately prevail on the election of each individual candidate, citywide. While a geographic array may thus be insured, a racial or political array may still be defeated by the vote at large. Thus, while the residence requirement is a factor in defendants' favor, it is not by any means a conclusive factor.

Weighing all of these various indicia of dilution, this Court can only conclude that multi-member districting, as it operates in the City of Dothan, has the effect of diluting the political power of blacks in that city.

### III. *Remedy*

While the multi-member districting plan in use in Dothan has the effect of diluting political power held by blacks there, the Court recognized that this is a highly unusual case. For whatever reason, one black was elected in the past election, and he could not have been elected without white votes. A new set of city officers has been elected. City officials testified at trial that they had substantial and significant plans to remedy the deficiencies in city services which exist in the black wards. The white city officials, in short, have firmly assured this Court that they believe that they will be able to serve the needs of all Dothan citizens, whether black or white, given enough time. For example, the new mayor of Dothan pointed out that he is powerless to appoint blacks to boards and commissions until the appearance of vacancies.

The posture of this case is such that, while plaintiffs have proved a strong prima facie case of dilution, the applicable legal standards are heavily weighted in favor of the consideration of past events. No one can deny that the past record of the City of Dothan shows a long line of deprivations of black rights by governmental officials. However, the city officials now in office claim that, in essence, a new day has come, that blacks and whites in Dothan can work together politically to solve citywide problems and remedy the effects of past discrimination. Whether that is true or not remains to be seen.

However, precisely because the new city government has at least made a start toward granting blacks a share in the operation of the city, this Court is prepared to attempt to avoid, if possible, interference in the design of the Dothan city government. Certainly any such relief which this Court could offer would be disruptive to the orderly function of the city government and should be avoided if possible.

The latitude of the equitable discretion of a federal court, or of any court sitting in equity, is indeed broad. This is especially true in the remedying of constitutional wrongs. "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Swann v. Bd. of Educ., 402 U.S. 1, 15, 91 S.Ct. 1267,

1276, 28 L.Ed.2d 554 (1971). The equity jurisdiction of a court is said to be distinguished by the qualities of "[f]lexibility rather than rigidity . . . [, and by] mercy and practicality." Hecht v. Bowles, 321 U.S. 321, 329–330, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944). A flexible remedy is thus in the highest traditions of a court of equity.

Rather than unduly disrupt the new government of the City of Dothan at this time, this Court will exercise its equitable discretion by staying proceedings in this case for one year. During this period, the parties to this litigation will have an opportunity to demonstrate whether the government of the City of Dothan is to be opened to blacks, in their fair share, as has not been done in the past. The intense scrutiny of this litigation has hopefully pointed out to city officials in Dothan many problems which are in need of improvement in order to offer blacks meaningful access to their government. Both parties to this litigation will file reports, both six months and one year from the date of this order, showing the progress, or lack of it, which the city has made in opening its government meaningfully to all citizens, a goal which the city professes to hold. At the end of one year, this Court (assuming the six month reports justify further delay) will determine whether additional relief is necessary.

### IV. *Attorneys' Fees*

■ While the general rule in civil litigation is that attorneys' fees are not awarded to the prevailing litigant, there have come to be recognized several classes of litigation in which attorneys' fees may, and in some instances should, be awarded to the prevailing party. In the field of civil rights litigation, statutes frequently provide that the court, in its discretion, may award attorneys' fees to the prevailing party. See, *e. g.*, 42 U.S.C. § 2000a–3(b) (Title II litigation). While these statutes provide that attorneys' fees may be granted in the discretion of the court, they have been interpreted to mean that the prevailing party

will ordinarily and as a matter of course recover attorneys' fees, absent special circumstances which would render such an award unjust. See Northcross v. Bd. of Educ., 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973); Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); Johnson v. Combs, 471 F.2d 84, 86 (5th Cir. 1972); Lea v. Cone Mills Corp., 438 F.2d 86, 88 (4th Cir. 1971); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 430 (8th Cir. 1970); Miller v. Amusement Enterprises, Inc., 426 F.2d 534, 536–537 (5th Cir. 1970). Under such a statute, failure to award attorneys' fees has been held to be an abuse of discretion by the trial judge. Lea v. Cone Mills Corp., 438 F.2d 86, 88 (4th Cir. 1971).

■ In civil rights class action litigation not involving statutes containing attorneys' fee provisions, fees have nevertheless generally been granted to the prevailing litigant. The rationale for such an award is that the plaintiff, as named representative of a class, has taken upon himself the burden of suing as a "private attorney general" to effectuate some strong congressional or constitutional policy. The "private attorney general" theory is based upon the idea that it would be inequitable for individual plaintiffs, suing on behalf of large groups of beneficiaries, to bear the burden and substantial expense of litigation to obtain a right frequently, though not always, unaccompanied by any pecuniary gain. The "private attorney general" theory, which is based upon the general equitable discretion of the court, has been widely used in federal litigation under the securities statutes. See, *e. g.*, Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). However, the litigant in a civil rights case, even more than one in a securities case, acts as a "private attorney general." Accordingly, in litigation involving civil rights statutes containing no explicit provisions for the award of attorneys' fees, courts have shown little hesitancy in awarding such fees under

the discretion of the court. Gates v. Collier, 489 F.2d 298, 300 n. 1 (5th Cir. 1973); Knight v. Auciello, 453 F.2d 852 (1st Cir. 1972); Lee v. Southern Home Sites, 444 F.2d 143 (5th Cir. 1971).

This Court has occasionally awarded attorneys' fees to plaintiffs who prevail in civil rights class action cases, where it was demonstrated that individual plaintiffs could not reasonably be expected to bear the burden of high legal costs, especially in view of the complete or relative lack of personal financial incentive for the bringing of suit, and in view of the large number of persons expected to benefit from the vindication of the right violated. This Court has recently awarded attorneys' fees in, among other cases, Wyatt v. Stickney, 344 F. Supp. 373, 408–411 (M.D.Ala.1972); Sims v. Amos, 340 F.Supp. 691, 694 (M.D.Ala.1972); and NAACP v. Allen, 340 F.Supp. 703, 708 (M.D.Ala.1972). In those cases, despite the availability of a reason for the application of more traditional punitive imposition of attorneys' fees, this Court expressly based its award upon a basis much broader than any punitive rationale. In *Wyatt*, this Court noted that

> In order to eliminate the impediments to *pro bono publico* litigation and to carry out congressional policy, an award of attorneys' fees not only is essential but is legally required.

Wyatt v. Stickney, 344 F.Supp. 373, 409 (M.D.Ala.1972). In *Sims*, this Court noted that because plaintiffs had become private attorneys general in a reapportionment case, they were entitled to an award of attorneys' fees

> regardless of defendants' good or bad faith . . . Indeed, under such circumstances, the award loses much of its discretionary character and becomes a part of the effective remedy a court should fashion to encourage public minded suits . . . .

Sims v. Amos, 340 F.Supp. 691, 694 (M.D.Ala.1972). *Accord*, NAACP v. Allen, 340 F.Supp. 703, 708–709 (M.D.Ala. 1972).

This case is certainly an appropriate case for the award of an interim attorneys' fee to plaintiffs, who have prevailed on the merits. Both parties will, within 15 days, submit affidavits from practicing attorneys in this district regarding a reasonable attorneys' fee in the present case. Parties and affiants should bear in mind the twelve criteria recently enumerated in Johnson v. Georgia Highway Express, 488 F.2d 714 (5th Cir. 1974).