Sam Ulysses **TURNER**, Plaintiff-
Appellee,

v.

**John J. McKEITHEN et al., Defendants,**

**Ouachita Parish Police Jury, Defendant-
Appellant.**

**No. 71-2221.**

United States Court of Appeals,
Fifth Circuit.

Dec. 28, 1973.

J. Carl Parkerson, Dist. Atty., Gilbert Brown, Jr., Asst. Dist. Atty., Monroe, La., for defendant-appellant.

Paul Henry Kidd, Robert P. McLeod, Monroe, La., for plaintiff-appellee.

Before BROWN, Chief Judge, and INGRAHAM and RONEY, Circuit Judges.

John R. BROWN, Chief Judge:

We have held this 1971 Ouachita Parish Police Jury reapportionment case in abeyance pending the Supreme Court's decision in White v. Regester, 1973, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314, affirming in part, reversing in part, Graves v. Barnes, W.D.Tex., 1972, 343 F.Supp. 704 (three-judge court) and our own en banc decision in Zimmer v. McKeithen, 5 Cir., 1973, 485 F.2d 1297, reversing 5 Cir., 1972, 467 F.2d 1381. On the basis of the highly beneficial guidance provided by these cases, we affirm the District Court's determination that the Police Jury's proposed multi-member reapportionment plan unconstitutionally dilutes the potential for political participation by the black community of Ouachita Parish.

*The History*

This class action, brought by the Challengers on behalf of the registered voters of former Ward 10 of Ouachita Parish, attacking the apportionment of the Parish Police Jury was instituted in February 1970.[1] Under Louisiana law, the Parish Police Jury is charged with the maintenance of roads and drainage, regulation of taverns, levy of taxes and a variety of other responsibilities relating to the health and welfare of the public.[2]

At the commencement of this litigation, Quachita Parish was divided into ten wards. Seven of the wards each elected a single member to the Police Jury while wards 3, 5 and 10 each elected four members.

As of the 1970 census, blacks constituted 27.4% of the population of Ouachita Parish. The great majority of blacks were concentrated within wards 3 and 10—two of the multi-member wards. Under the existing apportionment scheme, blacks constituted 42.5% of the total population of ward 3 and 37% of the total population of ward 10.

Prior to trial, the parties stipulated that the existing apportionment scheme was unconstitutional due to significant deviations[3] from the "one man—one vote" principle.

The District Court requested that the parties submit reapportionment plans. On May 12, 1971 before the plans were submitted, a hearing was held at which time the Challenger injected the issue of "dilution" of the minority vote into the case. On June 12, 1971, a week before the case was scheduled for trial, the Supreme Court decided Whitcomb v. Chavis, 1971, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363, in which the question of dilution of the minority vote was discussed in far greater detail than it had been up to that time.

1. The District Court implemented the Challenger's substantially similar plans for reapportioning the School Board and the Police Jury. Both plans were originally attacked on appeal. On June 12, 1972, the Court granted the School Board's motion to dismiss its appeal.

2. See La.Rev.Stat.Ann. 33:1236.

3. Maximum variances as great as 37% existed.

The Police Jury proposed a plan under which the 10 existing wards would be consolidated into three new multi-member districts without splitting any of the former wards.[4] The Challengers submitted two single-member district plans, one of which provided for six districts, the other for nine.

At a hearing held before the District Court on June 18, the parties presented witnesses and offered evidence in support of their respective plans. The Court found that the Police Jury's proposed plan was constitutionally defective for two separate reasons.

First, the Court held that the Police Jury had not carried the burden of justifying the 6.1% maximum population variance (per juror) between the largest and the smallest districts considering that the plan submitted by the Challenger and adopted by the Court, provided for a maximum variance of only 3.5%. As a result the plan did not satisfy the "one man—one vote" principle.

Secondly, the District Court found that the Police Jury's plan was constitutionally defective because the multi-member districts "would tend to dilute and cancel out the present voting strength of either one or both of the two large identifiable black areas in Ouachita Parish" and would therefore result in "invidious discrimination."

The District Court found that the Challenger's six district single-member plan complied with constitutional requirements and implemented that plan prior to the 1971 election. The Parish's first black police juror has been elected pursuant to the plan.[5]

On appeal, the Police Jury urges that (1) the deviations from the "one man—one vote" principle inherent in its proposal were constitutionally justified by legitimate state interests; (2) that its multi-member plan did not unconstitutionally dilute the black voting strength of the Parish; (3) that the District Court did not allow it a sufficient opportunity to prepare its own plans and study Challenger's.

Since we agree that the District Court correctly concluded that the multi-member plan submitted by the Police Jury unconstitutionally diluted the black vote, we find it unnecessary to determine whether the District Court's conclusion on the "population variance" question is consonant with Mahan v. Howell, 1973, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320; and Gaffney v. Cummings, 1973, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298. We turn then to dilution—a question on which the controlling authority is still warm from the presses.

### The Standard

Last term in White v. Regester, *supra*, a Texas case, the Supreme Court sustained a three-judge District Court finding that multi-member districting plans tended to minimize or cancel out the voting strength of blacks in Dallas County and Mexican-Americans in Bexar County.[6] Shortly after the decision in White v. Regester, this Court sitting en banc in Zimmer v. McKeithen, *supra*, held that the at-large voting scheme employed for electing Police Jurors and School Board members in East Carroll Parish, Louisiana unconstitutionally diluted the voting strength of the black residents of the Parish.

White v. Regester and *Zimmer* recognized that "access to the political process * * * [is] * * * the barometer of dilution of minority voting

---

4. Under this plan District I (formerly wards 1, 2 and 10) would elect six members, District II (formerly wards 3 and 4) would elect four members, and District III (formerly wards 5, 6, 7, 8 & 9) would elect five members.

5. The first black member of the Parish School Board was elected under the similar plan adopted for the School Board. See note 1, *supra*.

6. The Court had discussed the question in previous cases but had not sustained a finding of dilution. See Whitcomb v. Chavis, *supra*; Burns v. Richardson, 1966, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376; Fortson v. Dorsey, 1965, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401.

strength." *Zimmer, supra,* at 1303. Therefore, "the plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." White v. Regester, *supra,* 412 U.S. at 766, 93 S.Ct. at 2339, 37 L.Ed.2d at 324.

■ Both White v. Regester and *Zimmer* set forth a number of factors which are relevant in determining whether a minority group in fact lacks meaningful access to the political process. Among the factors entitled to consideration are the continuing effects of past discrimination on the minority group's ability to participate in the political process, the opportunity for the minority group to participate in the candidate selection process, the responsiveness of elected officials to the particular concerns of the minority group, and the strength of the state interest in multi-member or at-large voting.[7]

Furthermore, both White v. Regester and *Zimmer* recognized that the presence of various structural voting devices such as a majority vote requirement, anti-single shot voting, large districts, and lack of residency requirements in a district or its geographical subdivisions may increase the potential for dilution under a multi-member or at-large arrangement.[8] Dilution, as with so many complex factual determinations turns on an aggregation of the circumstances.

### The Circumstances

Measured against these guidelines, the District Court correctly concluded that the Police Jury's multi-member plan was constitutionally unacceptable because it tended to dilute the potential for minority participation in the political process.

In evaluating the opportunities for meaningful access to the political process of the black community in East Carroll Parish, *Zimmer* recognized the presence of the continuing debilitating effects of the pervasive statewide history of racial discrimination in Louisiana, 485 F.2d at 1306.[9] Open, flagrant, unsophisticated, purposeful discrimination against blacks has been the long time pattern in Ouachita Parish. United States v. Louisiana, note 9, *supra,* 225 F.Supp. at 379–382.[10] A dual school system in Ouachita Parish was only abandoned under Federal Court order.[11]

And the ballot box was opened only to those who satisfied the unconstitutional statewide interpretation test invalidated by United States v. Louisiana.[12]

---

7. White v. Regester, supra, 412 U.S. at 765, 93 S.Ct. at 2339, 37 L.Ed.2d 324–326; Zimmer, supra, 485 F.2d at 1305.

8. We agree that "multimember districts— * * * in logic of analysis are merely one form of at-large voting." Zimmer, supra (Clark, J. dissenting) 485 F.2d at 1315.

9. See Judge Wisdom's opinion in United States v. Louisiana, E.D.La., 1963, 225 F. Supp. 355 (three-judge court), aff'd, 380 U. S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 for an extensive history of racial discrimination in the electoral process of Louisiana.

10. "Beginning April 15, 1956, the Citizens Council of Ouachita Parish challenged all 5,782 of the registered Negroes. Of these, all but 595 were striken from the rolls." United States v. Louisiana, note 9, supra, 225 F.Supp. at 379 n. 76. Of course Ouachita Parish was not alone. See, e. g., United States v. Ward, 5 Cir., 1965, 349 F.2d 795 (Madison Parish); Toney v. White, 5 Cir. (en banc), 1973, 476 F.2d 203 (Madison Parish).

11. Taylor v. Ouachita Parish School Board, 5 Cir., 1970, 424 F.2d 324; 5 Cir., 1969, 420 F.2d 692, D.C.La., 303 F.Supp. 394, 5th Cir., 417 F.2d 801, cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180; W.D.La., 293 F. Supp. 84. See also Andrews v. City of Monroe, 5 Cir., 1970, 425 F.2d 1017; Andrews v. City of Monroe, 5 Cir., 1967, 380 F.2d 385, cert. denied, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104; 5 Cir., 1966, 370 F.2d 925.

12. See United States v. Louisiana, note 9, supra, 225 F.Supp. at 381 n. 77. "In at least two parishes, Ouachita and East Feliciana, one ground for challenging Negroes was that they had not interpreted or were not able to interpret a constitutional section, even

No contradiction is made of the Challenger's supplemental brief which tells us that Ouachita Parish was one of eight Louisiana parishes to which Federal Voting Registrars were sent to register black voters pursuant to the Voting Rights Act of 1965. And, as of January 1971, 4,117 Ouachita Parish blacks were listed upon the federal voter registration rolls as contrasted with 2,952 blacks on the state registration roll.[13] Prior to October 3, 1964, 73.6% of the white voting age population of Ouachita Parish was registered as opposed to 10.6% of the black voting age population.[14] As in White v. Regester and *Zimmer,* so here we recognize that despite recent progress, the inhibiting effects of such blantant and pervasive discrimination have not yet been erased.

Unlike White v. Regester and *Zimmer* where at least a few minority members had been elected, the District Court found as a fact that at the time of trial no black had ever been elected to public office in Ouachita Parish since reconstruction although a number of blacks had run.[15]

The record entitled the District Court to consider the failure to include the black community in the candidate slanting process—perhaps the most important stage of the political process in Ouachita Parish which has been dominated in the past by one political party. Rather, the black vote has been solicited at a stage when the actual candidate selection has already occurred and the possibility for meaningful influence is significantly diminished. Of course this is an old weapon in the arsenal of voter discrimination which the Supreme Court years ago struck down when it changed the Democratic Party of Texas from a private club to a State enterprise.[16]

While there is little evidence in the record that former "representatives"[17] on the Police Jury from the two black areas of concentration have been unresponsive to the interests of the black community,[18] *Zimmer* recognized that "the particular functions of the police jury" may "not easily lend themselves to unresponsive representation." The Court continued, however: "Were we to hold that the absence of a claim of representation unresponsive to a minority's needs foreclosed constitutional attack, the voting strength of minorities could be freely diluted without fear of constitutional restraint." 485 F.2d 1306–1307 n. 26.

Although the Police Jury apportionment system stipulated unconstitutional contained three multi-member districts,[19] the Parish had hardly evidenced a total commitment to multi-member districting since 7 of the 10 districts elected only one member. By contrast the reapportionment plan submitted to the District Court by the Police

---

though the test had not been used in either parish before the purge * * *.
    The discrimination brought about by the purge and the use of the interpretation test was frozen into the system in parishes such as Bienville, DeSoto, Jackson, Ouachita and Rapides, which have permanent registration." United States v. Louisiana, note 9, *supra* at 382.

13. Report of the Louisiana Board of Registration (1971).

14. Political Participation: A Report of the United States Commission on Civil Rights (1968).

15. It is unclear from the record whether any blacks had run for the Police Jury.

16. See Smith v. Allwright, 1944, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987; Nixon v. Condon, 1932, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984; Nixon v. Herndon, 1927, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759. See also United States v. Classic, 1941, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (racial discrimination in Louisiana Congressional primary).

17. Many of whom have not actually lived in the black section.

18. The Parish's long history of segregation and voter registration discrimination certainly was a relevant evidentiary factor on the likely degree of concern by local officials for the interests of the black community.

19. Not surprisingly, both of the major concentrations of black population were formerly enveloped in multi-member districts.

Jury provides for only multi-member districts.

Certain of the structural devices which must be regarded with suspicion where the issue of dilution has been properly raised are present in Ouachita Parish. There is no requirement of residency within geographical subdistricts of the multi-member districts under the Police Jury's proposal. A majority vote requirement [20] and an anti-single shot [21] voting provision appear to apply to the primaries for the election of Police Jurors.

The District Court took notice of the fact that the Police Jury's proposed reapportionment plan, by tacking substantially white wards onto the two former wards containing the major concentrations of black population would slightly decrease the proportional strength of blacks living in these two identifiable "black" districts.[22] By the same token, of course, the proportional strength of those blacks living in the substantially white wards which were "tacked on" to the wards containing the major concentrations of blacks would be increased. While such increases or decreases in proportional strength resulting from the change from one apportionment system to another may in some cases provide significant evidence of motive or effect, we do not consider these slight variations of compelling significance in this case.

■ The constitutional problem with the Police Jury's reapportionment plan is not rooted in the rough edges of the *change* from the old apportionment system which encompassed the areas of black concentration in multi-member districts, to the new completely multi-member plan. Rather it is that the particular employment of multi-member districts here at issue [23] in the political and

---

20. See La.Rev.Stat.Ann. 18:358. Only a plurality vote is required in the general election, however. La.Rev.Stat.Ann. 18:550.

21. La.Rev.Stat.Ann. 18:351.

22. See notes 4 and 19, *supra.*

23. From the record it appears likely that the employment of multi-member districts in the areas of black concentration under the previous apportionment scheme—stipulated to be unconstitutional under the "one man-one vote" principle—could have been subjected to successful constitutional challenge for dilution.

We recognize, of course, that multi-member representation is not per se unconstitutional. See White v. Regester, *supra,* 412 U.S. at 765, 93 S.Ct. at 2339, 37 L.Ed.2d at 324. However, where a state or political subdivision attempts to employ multi-member districts in the wake of a history of pervasive racial discrimination, extreme care must be used in order to protect against the potential for dilution.

*Zimmer* recognized that multi-member districts may be used

"*where a district court determines* that significant interests would be advanced by the use of multi-member districts and [that] the use of single-member districts would jeopardize constitutional requirements . . . . But these significant interests must not themselves be rooted in racial discrimination. . . .

The preference may also yield where a *district court determines* that multi-member districts afford minorities a greater opportunity for participation in the political processes than do single-member districts." (Emphasis added). 485 F.2d 1308.

The plan in question clearly does not satisfy these requirements.

The Police Jury has failed to offer persuasive justification for the need for multi-member districting in the Parish. In response to the "population variance" issue, the Police Jury asserted that its proposal was intended to include rural and urban territory in each district, so that every juror would have rural roads to maintain (urban roads being maintained by the city of Monroe). This has been recognized as a legitimate legislative goal. See Howard v. Adams County Board of Supervisors, 5 Cir., 1972, 453 F.2d 455, cert. denied, 407 U.S. 925, 92 S.Ct. 2461, 32 L.Ed.2d 812 (Howard I). No reason was given, however, why this couldn't be accomplished through single-member districts.

The Police Jury also argued that its plan was intended to preserve former ward boundaries to the extent possible. Given the degree of variance from the "one man-one vote" principle under the original apportionment scheme, it is clear that many of the former boundaries would need to be abandoned. See Howard v. Adams County Board of Supervisors, 5 Cir., 1973, 480 F.2d 978, 980 (Howard II). In addition, both of the Challenger's single-member plan preserved seven of the original ten districts intact (neces-

historical context of Quachita Parish unduly limits the potential for black participation in the political process.

■■ While a minority group is not constitutionally entitled to an apportionment structure designed to maximize its political advantage,[24] neither may it be enveloped in a structure which will necessarily minimize its potential for meaningful access to the political process. See Graves v. Barnes, 1972, 343 F.Supp. 704, 734, aff'd in part, rev'd in part, sub nom. White v. Regester, *supra*.

■ In view of the total factual matrix, we haven't any doubt that the district court could conclude that the Police Jury's proposed multi-member reapportionment plan for Ouachita Parish unconstitutionally minimized the access of the black community to the political process.[25]

### The Procedure

■ After determining that the Police Jury's multi-member plan was constitutionally deficient, the District Court, faced with an upcoming election and a crowded docket ordered that the Challenger's proposed six district single-member plan be implemented immediately recognizing that "when district courts are forced to fashion apportionment plans, single-member districts are preferable to large multi-member districts as a general matter." Connor v. Johnson, 1970, 402 U.S. 690, 692, 91 S.Ct. 1760, 1762, 29 L.Ed.2d 268, 270. There is ample evidence in the record to support the District Court's conclusion that the plan follows "clear and simple boundary lines"[26] and consists of "contiguous" and "compact" districts. Since the two major areas of black concentration are preserved intact no "dilution" issue is created by the plan.[27] Thus Challenger's plan, implemented by the District Court is constitutionally sufficient.

■ The Police Jury argues that it was not allowed sufficient time to study Challenger's plan and submit an adequate plan of its own, but the record does not support this claim. Admittedly, the question of minority "dilution" belatedly became the primary issue in what had previously been a "one man—one vote" case.

At a hearing held with counsel in chambers on May 14, 1971, the Court ordered that time would be allowed for the parties to obtain census enumeration print-outs breaking down the population

sarily combining some of them, of course).

The district court found as a fact that "single-member district plans were easily devisable for both defendants [Police Jury and School Board] and that there were no 'insurmountable barriers' for either [of them] to overcome in devising their own single-member district plan aside from their own refusal to so do."

The Court further found "no evidence in the record to explain or justify the 6.1% and 5.5% deviations inherent in the plans submitted by the defendants . . . . ."

24. A minority group is not constitutionally entitled to one or more "safe" or majority districts simply because an apportionment scheme could be drawn to reach this result. See Whitcomb v. Chavis, 1971, 403 U.S. at 156–160, 91 S.Ct. at 1875, 29 L.Ed.2d at 383–385; Howard I, *supra*, 453 F.2d at 458. However, in dilution cases as in school integration cases, the federal courts must be color blind/color conscious. See *Zimmer, supra* at 1308 n. 27.

There is no agreement on whether the political interests of a minority group are best maximized by an overwhelming majority in a single district, bare majorities in more than one district or a substantial proportion of the voters in a number of districts. See, e. g., Wright v. Rockefeller, 1964, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512.

25. Unlike East Carroll Parish with its 6,183 population Ouachita Parish is both rural and urban with a total population of 39,095 and contains Monroe, the fifth largest city in Louisiana.

Also, unlike East Carroll where blacks constituted a majority of the total population, the blacks in Ouachita Parish are in the minority on a population basis.

26. "[U]sually being railroad lines, the Ouachita River, bayous, existing ward lines, Interstate Highway 20 and the city limits line of the City of Monroe." Findings of Fact No. 25.

27. In Howard I, *supra*, 453 F.2d at 458 n. 2, this Court recognized that the dilution principle, though developed in the context of multi-member districting, was applicable to single-member districts as well.

by race so that the parties could take the issue of "dilution" into consideration in developing their plans.

In another hearing held on June 2, 1971 "there was extensive argument and discussion on the question of the preference of single-member districts versus multi-member districts and the 'dilution' of racial voting strength."[28] At this time, the Challengers submitted a nine district single-member plan. The Police Jury requested and was granted a continuance until June 18 in order to study this plan.

The Challengers submitted a revised nine district single-member plan on June 17. On June 18, the first day of the trial, the Challengers submitted a six district single-member plan and the Police Jury submitted a three district multi-member plan. Since the trial began on June 18, a Friday, and was concluded on June 21, a Monday, both parties were able to study each others plan over the weekend.

On June 21, the Police Jury objected to the admission of Challenger's six district plan on the grounds that it was irrelevant and immaterial but not on the grounds of surprise. Near the very end of the proceeding, the Police Jury requested a further continuance "to consider another plan." The District Court denied the request because it would be unable to schedule another hearing before the qualifying deadlines for the upcoming party primaries.

While we recognize that a "legislative reapportionment is primarily a matter for legislative consideration and determination," judicial relief became appropriate when the Police Jury failed "to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." Reynolds v. Sims, 1963, 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506, 541.

All of this is an afterthought by the Police Jury. Rather, the Police Jury was convinced that its three district multi-member scheme would withstand constitutional challenge on the "dilution" as well as the "one man—one vote" questions and was therefore determined to stand on the plan. There is nothing in the record to suggest that the Police Jury would have tendered its own single-member plan prior to the qualifying deadline had the Court granted its request for a further continuance.

We cannot say that the District Court erred in denying the request in view of the severe time constrictions where it had determined that the Challenger's proposed plan was constitutionally adequate.

### The Relief

In Burns v. Richardson, 1965, 384 U.S. 73, 85, 86 S.Ct. 1286, 16 L.Ed.2d 376, 387, the Supreme Court recognized that "the state remains free to adopt other plans for apportionment and the present interim plan [the Court's plan] will remain in effect for no longer time than is necessary to adopt a permanent plan."

If in light of White v. Regester, Zimmer, and our present decision the Police Jury believes that it is able to devise a single-member plan[29] which will satisfy constitutional requirements and better serve its own needs than the plan implemented by the District Court, it is of course free to propose such a plan to the Court for consideration. We express no view on what action, if any, the Court should take on any proposal, but of course until the Court acts otherwise the plan adopted by the District Court will remain in effect, and the burden is on the Police Jury, not the Challenger, to demonstrate a need for modification.

Affirmed.

---

28. District Court's Findings of Fact No. 7.

29. A multi-member plan would be permissible only if it was capable of meeting the standards set forth in Zimmer. See note 23, supra.