**Robert (Robb) PITTS, Plaintiff,**
**Goodwyn Cates, Intervenor,**

v.

**George D. BUSBEE et al., Defendants.**

**Civ. A. No. C74-1060A.**

United States District Court,
N. D. Georgia,
Atlanta Division.

June 2, 1975.

Bernard Parks, George L. Howell and Carl T. Horton, Patterson, Parks & Franklin, Atlanta, Ga., for Pitts.

Charles L. Weltner, Atlanta, Ga., for Cates.

Michael H. Chanin, Atlanta, Ga., for Abernathy.

Arthur K. Bolton, Atty. Gen., Dorothy Y. Kirkley, Asst. Atty. Gen., Atlanta, Ga., for Busbee and Fortson.

John Tye Ferguson, Webb, Parker, Young & Ferguson, Atlanta, Ga., for Hammond.

## ORDER

EDENFIELD, Chief Judge.

In 1952, as part of an overall attempt to coordinate the governments of Atlanta and Fulton County, the Georgia General Assembly enacted a bill which established a new Fulton County Commission composed of three commissioners, all of whom were required to run for specific posts and were elected at-large in the entire county by plurality vote. Georgia Laws, 1952, p. 2672. In 1970 the General Assembly enacted legislation requiring that all elections, including those for Fulton County commissioner, be by majority vote. Ga.Code Ann. § 34–1513. In 1973 and 1974 the General Assembly attempted to remodel the Fulton County Commission into a seven-member body. Georgia Laws, 1973, p. 2462; Georgia Laws, 1974, p. 2128. Pursuant to the Voting Rights Act of 1965, 42 U.S.C. § 1973c, this legislation was submitted to the Attorney General who objected to portions of it. The Board of Elections of Fulton County, nevertheless, evinced an intention to proceed with implementation of a revised version of the 1973 and 1974 Acts. At this juncture the plaintiff filed this suit seeking an injunction against implementation of the Board of Elections plan and of the 1973 and 1974 Acts and a declaratory judgment that the 1952 Act was unconstitutional. This court referred plaintiff's claim to a three-judge court which issued the requested injunctions and remanded the case to this court for "entry of an order setting forth an interim basis for conduct of the 1974 election of the Fulton County Board of Commissioners." 380 F.Supp. 4, 8. On the same day this court issued such an order. 380 F.Supp. 8. The defendant state officials appealed. The

Circuit Court, although finding the interim plan to be "very reasonable", nevertheless noted that this court had never addressed "the intrinsic validity under the Constitution and Supremacy Clause cum § 1983, of the 1952 Act," 511 F.2d 126 (5th Cir. 1975), and remanded the case to this court with instructions to do just that.

On April 21, 1975, this court held a day-long hearing on the constitutionality of the 1952 Act and invited the parties to file additional briefs and written evidence.

■■ Multi-member and at-large districts[1] are not per se unconstitutional. White v. Regester, 412 U.S. 755, 765, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). "However, where a state or political subdivision attempts to employ, multi-member districts in the wake of a history of pervasive racial discrimination, extreme care must be used in order to protect against the potential for dilution." Turner v. McKeithan, 490 F.2d 191, 196 in n. 23. The majority of such schemes evaluated by the courts have been found to be constitutionally deficient. The Supreme Court has provided this court with a broad formulation of the test to be applied in determining whether a specific multi-member district is unconstitutional. "The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." White, supra, 412 U.S. at 766, 93 S.Ct. at 2339. Stated differently, a multi-member district is uncon-

stitutional if it has the effect of cancelling out or minimizing the voting strength of racial groups. White, supra at 765, 93 S.Ct. 2332. As the courts have attempted to apply these imprecise formulations to concrete situations they have focused on a number of factors as indicative of the existence of the forbidden dilution of the minority vote. The existence of one of these factors is insufficient, standing alone, to support a finding of unconstitutionality. Conversely, it is not required that the presence of all the factors be demonstrated to support such a finding. "The fact of dilution is established upon proof of the existence of an aggregate of these factors." Zimmer v. McKeithan, 485 F.2d 1297, 1305 (5th Cir. 1973) (en banc). What follows is an attempt by this court to identify those factors and to determine which of them are present in this case. The order in which the factors are presented does not necessarily represent an evaluation of the weight to which they are entitled, either in this case or generally.

1. Is there a present or historical disparity between the number of minority residents and the number of minority representatives? White, supra, 412 U.S. at 769, 93 S.Ct. 2332.

There can be no doubt that this factor applies to the Fulton County Commission. According to the Stipulation of Facts entered into by the parties the population of Fulton County during the period in which the 1952 Act has been on the books has varied between 30.7% non-white in 1950 and 39.3% non-white in 1970. Stipulation of Facts Nos. 3 and 4. Despite this substantial minority population, it is uncontested, although

---

1. There apparently is no constitutional distinction between (1) a statute which provides for a multi-member district within a legislative body which serves a larger geographical area and voting population than the district in question (e. g., a county delegation to a state legislature) and (2) a statute which provides for at-large election of more than one member of a legislative body to represent the entire area and voting population governed by the legislative body (e. g., a county commission or city council). Turner v. McKeithan, 490 F.2d 191, 194 at n. 8 (5th Cir. 1973). The terms "multi-member" and "at-large" are therefore used interchangeably in this opinion to designate variant forms of the same electoral mechanism.

unstipulated, that no non-white has ever been elected to the Fulton County Commission under the 1952 Act. By contrast, in the Bexar County, Texas, district struck down by the Supreme Court in *White*, the minority population was only 29% of the total but had nevertheless been able to elect an insignificant number of representatives. *White, supra* at 768–69, 93 S.Ct. 2332.

■ In their brief the defendant state officials have insisted that the court should consider the substantial number of black officials elected to other governmental offices wholly or in significant part by Fulton County residents. The state officials contend that the presence of these black officials establishes that blacks fully participate in the Fulton County election process. The court cannot accept the logic of this conclusion. What is being reviewed here is whether a certain *election procedure* tends to dilute the effectiveness of minority votes and political participation; the ease with which members of the minority can vote is only one factor in solving that problem. It appears to the court that from the same premise, it is possible, with equal logic, to champion the opposite conclusion: that the presence of the black elected officials proves that under almost any other conceivable electoral scheme the minority could achieve more equal representation on the Fulton County Commission. "While a minority group is not constitutionally entitled to an apportionment structure designed to maximize its political advantage, neither may it be enveloped in a structure which will necessarily minimize its potential for meaningful access to the political process." *Turner, supra* at 197. The election of black representatives under most other contemporary political election structures and under this court's interim election plan for the County Commission can arguably be taken to demonstrate, rather than disprove, that it is the election procedures embodied in the 1952 Act which are responsible for the retardation of minority progress in entering county government.

■ The court concludes that the factor of minority underrepresentation is clearly present in this case. The presence of that factor alone is, however, insufficient to establish the invalidity of the 1952 Act. *White, supra*, 412 U.S. at 766, 93 S.Ct. 2332, *Zimmer, supra* at 1305, at n. 18.

2. Has there been a history of the minority being denied access, or granted only limited access, to the process of slating candidates? *White, supra*, 412 U.S. at 766, 93 S.Ct. 2332, *Zimmer, supra* at 1305, *Turner, supra* at 194.

Fulton County has never had the kind of slating process which was utilized in Dallas County, Texas, and condemned in *White*. The Fifth Circuit, however, has based a finding that this factor is present on a determination that there was a history of racially discriminatory conduct in the primary process, even if the offending practices have been discontinued. *Zimmer, supra* at 1307. There is a history of such practices in Georgia. Chapman v. King, 154 F.2d 460 (5th Cir.), cert. denied, 327 U.S. 800, 66 S.Ct. 905, 90 L.Ed. 1025 (1946) (all blacks excluded from state Democratic primary by operation of statewide rule). In Fulton County, however, these practices were discontinued at a relatively early date. Although there is some testimony indicating that there are lingering effects of those practices (testimony of John Lewis), in the court's view any such effects have largely been dissipated. It appears that the claim of discrimination presented here is not so much that there are remaining barriers to black registration and voting but rather that electoral procedures mandated by the 1952 Act tend to minimize the effect of the minority votes cast and in turn to cause minority electors to despair of gaining effective representation on the Fulton County Commission, irrespective of the successes they may have achieved in other election contests. The court concludes that there is a history of restriction of minority access to the slating process, but that the effects of that

history have largely dissipated and that this factor is not entitled to significant consideration in this case.

3. Have elected representatives historically been unresponsive to the particular needs and interests of the minority? *White, supra,* 412 U.S. at 768–69, 93 S.Ct. 2332, *Zimmer, supra* at 1305.

To the extent that objective evidence is available the court is compelled to find that, historically, the Fulton County Commission has consistently been unresponsive to minority needs and interests. Ever willing, even anxious, to afford a haven for whites fleeing the black central city, it appears that although the county contains a substantial minority of poor blacks, the Commission has historically never provided a single unit of public housing, has refused for racial reasons to permit anyone else to do so, and has refused to issue building permits for such projects even where they had previously been otherwise authorized. *See* detailed findings in 'Crow v. Brown, 332 F.Supp. 382 (N.D.Ga.1971), aff'd. 457 F.2d 788 (5th Cir. 1972), in which this court held that these actions violated the Equal Protection Clause.

In addition to the past judicial decisions which demonstrate unresponsiveness, it appears that even now the County Commission has not adopted any affirmative action plan to remedy the effects of past employment discrimination (testimony of Commissioner Farris) and, in fact, has absolutely no black department heads. (Testimony of Commissioner J. O. Wyatt.)

4. Is the history of state preference for multi-member districts a tenuous or recently expressed preference or is it rather a long-standing preference which evidences a strongly rooted state policy divorced from any consideration of racial discrimination? *Zimmer, supra* at 1305, 1307.

The statute under attack in this case is a law of local application only and relates only to the governance of one county. In Georgia such local bills are generally not debated and are routinely approved if they have the support of the representatives from the county affected. Institute of Government, The University of Georgia, Handbook for Georgia Legislators, pp. 56–60 (1973). (The 1973 edition is cited but for many years this publication has been periodically issued to all members of the Georgia General Assembly.) The court concludes that no state policy in this area has been demonstrated and that this factor is therefore neutral.[2] Yelverton v. Driggers, 370 F.Supp. 612, 618 (M.D.Ala. 1974) (Johnson, C. J.). "Nor does there exist any rational state policy explaining the present use of multi-member districts in any county." Graves v. Barnes, 378 F.Supp. 640, 643 (W.D.Tex.) (three-judge court), prob. juris. noted, White v. Regester, 417 U.S. 906, 94 S. Ct. 2601, 41 L.Ed.2d 210 (1974).

5. Does existence of past discrimination have any continuing effect which precludes or dilutes the minority groups' effective participation in the electoral process? *Zimmer, supra* at 1305, *Turner, supra* at 195.

On this factor the evidence is sketchy indeed. Some of the testimony of John Lewis tended to support the conclusion that there is such a continuing effect

---

2. The court would note that on two of the most recent occasions that the General Assembly has restructured the government of a county, the resulting legislation has borne a greater resemblance to this court's interim plan than to the structure set forth in the 1952 Act. *See* Georgia Laws, 1973, p. 2462; Georgia Laws, 1974, p. 2128 (providing a new county commission for Fulton County), and Georgia Laws, 1974, p. 2105 (providing a new consolidated government for Augusta and Richmond County). These local acts do not necessarily indicate the path the General Assembly will take in providing a replacement for the enjoined 1973 and 1974 Fulton County Acts. They do, however, demonstrate beyond cavil that there is no fixed state policy in favor of county governments elected entirely at large.

There is, however, a history of undisputable, pervasive de jure racial segregation in Georgia and Fulton County and that fact is entitled to be given weight. *Zimmer, supra* at 1306, *see especially Yelverton, supra* at 616. Where, as here, no black has ever been elected to the legislative body under attack, that fact is a strong indication of continuing lack of openness. *Turner, supra* at 195, *Yelverton, supra* at 616. The court concludes that past discrimination does have such a lingering effect but that over the years its strength has greatly diminished.

6. Have majority candidates used racist campaign tactics in the past? *White, supra,* 412 U.S. at 767, 93 S.Ct. 2332, Graves v. Barnes, *supra* at 643.

On this point there is evidence that racist campaign tactics have been utilized in recent elections (particularly the 1970 Thompson-Young congressional race) but this practice does not appear to have been pervasive.

7. Finally, in prior decisions other courts have drawn up a list of certain structural voting devices which, although neither inherently improper nor facially discriminatory, tend to enhance dilution and are therefore suspect. *White, supra,* 412 U.S. at 766, 93 S.Ct. 2332, *Zimmer, supra* at 1305.

■ A procedure which has the effect of diluting the minority vote cannot be sustained merely because it was not instituted for the purpose of doing so. There is no evidence which indicates that the 1952 Act was designed to minimize the effect of the minority vote. It is, nonetheless, true as all parties agreed, that, for whatever reason, every suspect voting procedure known to the courts (with one exception) is included in the 1952 Act. Those devices are:

(a) Requirement of election by majority vote, *White, supra,* 412 U.S. at 766, 93 S.Ct. 2332, *Zimmer, supra* at 1305 and 1306. This requirement stems not from the 1952 Act itself but from Georgia Code Ann. § 34–1513. *See* Wallace v. House, 377 F.Supp. 1192, 1196 (W.D. La.1974).

(b) A lack of any requirement that at-large candidates run from a particular geographical sub-district or reside in such sub-districts. *Turner, supra* at 194, *Graves, supra* at 643. Thus under the 1952 Act *all of the successful candidates* for commissioner can, and in fact did, reside outside of the areas in which the minority population is concentrated. *White, supra,* 412 U.S. 766 at n. 10, 93 S.Ct. 2332.

(c) The district in question is one with an extremely large population. Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).

(d) All at-large candidates are required to run for a specific post. *White, supra,* 412 U.S. at 766, 93 S.Ct. 2332, *Graves, supra* at 643.

The sole judicially recognized suspect device which is omitted in this case is an anti-single shot voting requirement. *Wallace, supra* at 1198. As the 1952 Act requires all candidates to run for a specific post, addition of such a provision would have no effect, and its absence is of no probative value.

■ After reviewing all of the evidence presented and after taking judicial notice of prior civil rights suits in this court involving Fulton County, the court concludes that although the present climate in Fulton County presents only minimal political barriers to black registration, the Fulton County government has never become equally open to participation by black and white members of the community. Although there is no evidence that the 1952 Act was drawn with the intention of furthering racial discrimination, the effect of the voting procedures embodied in that Act has been to grossly minimize

the possibility of blacks fully participating in their county government and particularly in the election of county commissioners of their choice.[3] Not only has no member of the minority group ever been elected to the county commission under the 1952 Act, but those members of the majority group who have been elected have been, in general unresponsive in a number of ways to the needs of the black community, most notably by their continuing effort to contain low-income housing within the predominantly black neighborhoods of the City of Atlanta. The court therefore concludes, and so declares, that the 1952 Act is unconstitutional.[4]

When the mandate of the Fifth Circuit was first received in this court (Pitts v. Busbee, 511 F.2d 126 (5th Cir. 1975)), the court was of the opinion, and so announced, that after a preliminary hearing on the constitutionality of the 1952 Act, a second hearing would be required with respect to provisional remedies in the future. Such future hearing may still become necessary. Although the General Assembly of Georgia has sufficient time to enact a constitutionally acceptable solution before the next general election in 1976, it may again fail to do so. If the General Assembly does act, it is entirely possible that there will be further challenges to any action taken. In either of these events the court may be called upon to prescribe further interim election procedures, particularly since the interim relief previously granted was drafted most hastily and in an attempt to meet the exigencies of a primary election, the filing deadline for which was then only hours away. Many worthwhile possibilities were therefore necessarily sacrificed in the interest of time.

None of these eventualities, however, may come to pass and a hearing upon them at this time would be clearly premature. The only duty remaining therefore under the mandate of the Fifth Circuit is to "place a reasonable limit upon the terms of the commissioners elected under [the prior] interim order . . . ."

■ The practice of courts ordering interim elections under any circumstances is not desirable and officials elected under such interim procedures should not be permitted to serve beyond the next general election for which a legislatively prescribed procedure is available. The next general election in this state will be held during 1976 and the terms of the present incumbents shall therefore terminate at the same time when other candidates elected at that general election take office; that is, January 1, 1977,[5] or at "the earlier commencement of terms of office of commissioners elected under a constitutional plan enacted by the Georgia General Assembly during or before its 1976 session."

It is so ordered.

3. At this juncture the court would emphasize its conviction that the Atlanta Metropolitan Area has made enormous strides in the task of eliminating the after-effects of Georgia's long history of de jure and de facto electoral racial discrimination. The court decides no more today than that the 1952 Act and the electoral procedures it embodies have operated to insure that such progress has been far slower in the realm of county government than in any other local governmental body.

4. As Justice Frankfurter once noted, the Constitution ". . . nullifies sophisticated as well as simple-minded modes of discrimination." Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281 (1939).

5. See Wallace, supra at 1201, for a discussion of this court's discretion in prescribing limitations to the duration of its interim plan.