**Benny AUSBERRY and Alfred Blakes, Individually and as representatives of black voters of Monroe, Louisiana**

v.

**The CITY OF MONROE, LOUISIANA, W. L. Howard, Individually and as Mayor thereof, Harland Prestridge, Individually and as member of Board of Commissioners thereof, Edwin Edwards, as Governor of State of Louisiana, and Paul Hardy, as Secretary of State of Louisiana.**

Civ. A. No. 74424.

United States District Court,
W. D. Louisiana,
Monroe Division.

Sept. 7, 1978.

---

Robert P. McLeod, Monroe, La., for plaintiff.

Haynes L. Harkey, Jr., Monroe City Atty., Charles D. Patten, III, Asst. City Atty., Monroe, La., for defendant.

Charles H. Ryan, Monroe, La., for intervenors.

Thompson, Sparks, Cudd & Dean, Theus, Grisham, Davis & Leigh, Monroe, La., for amici curiae.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.

### FINDINGS OF FACT

DAWKINS, District Judge.

A. HISTORY OF CASE:

1. This suit was filed as a class action on behalf of all black citizens in the City of Monroe on April 29, 1974. As amended, it seeks to have the at-large election of all members of the City of Monroe Commission Council declared unconstitutional and violative of the Fourteenth and Fifteenth Amendment rights of the black voters in the City of Monroe. It is contended that the vote of these citizens is "diluted" as a result of the at-large election scheme. We are requested to order implementation of an election plan that would not be violative of those rights.

2. Shortly after filing the action, plaintiffs sought to enjoin an election scheduled for August 17, 1974, to fill one of the vacancies on the Commission Council as well as obtaining other relief. A temporary restraining order was issued on June 20, 1974

and extended on June 28, 1974. However, because of other docket pressure, we were unable to schedule a hearing on the Motion for Preliminary Injunction prior to expiration of the temporary restraining order or prior to the election. Accordingly, the election was held as scheduled and the vacancy filled.

3. On December 2, 1974, the then City officials and the City filed a motion to "stay or continue further proceedings" in this case, alleging that the City had appointed a Charter Commission on July 9, 1974, to formulate a new city charter; that it had held thirteen (13) meetings at which it had received testimony and comments from public officials, professional experts in municipal government, and representatives from social, political and civic groups, all with the aid of staff members specially trained in political science and municipal government. The City urged us to take no further action until the Charter Commission had completed its work and a proposed charter had been submitted to the electorate for their approval or disapproval. We took no formal action on the motion to stay the proceedings, but no dispositive action was taken in the case until after the charter was submitted to the electorate on January 21, 1976. It was defeated.

4. On March 12, 1975, Plaintiffs filed another motion reiterating and reurging their request for a preliminary injunction and seeking a hearing at the earliest possible date to bring about an order eliminating the at-large election scheme.

5. On March 13, 1975, we stayed further proceedings in this case pending decision in an earlier filed and similar case, then before this Court. *Blacks United, etc. v. City of Shreveport,* 71 F.R.D. 623 (1976), 571 F.2d 248 (5th Cir. 1978). This action was taken in the interest of judicial economy and efficiency since both cases involved similar issues of alleged dilution of minority votes by an at-large election scheme operated within the context of the commission form of government.

6. On July 16, 1976, this Court issued its ruling in the *Blacks United, etc. v. City of Shreveport, supra,* case.

7. On August 6, 1976, Plaintiffs filed another supplemental motion for preliminary injunction and requests urging the fixing of this matter for hearing at the earliest possible time. This Court scheduled a hearing for August 30, 1976.

8. On August 20, 1976, the City officials again sought a continuance of the hearing, seeking at least a 90–day delay. We issued our ruling on the motion for continuance on August 20, 1976, denying same but providing "that upon good cause shown . . . we will keep the record open for a period of time not to exceed six weeks after August 30, 1978." The record was to be left open for Defendants to supplement the record if necessary. As stated in the ruling, we felt that "Plaintiffs herein have waited entirely long enough to have this action tried and submitted for decision."

9. Trial was had on August 30–31, 1976. Additionally, at the request of the City, the record was left open and additional testimony and exhibits on behalf of both parties were submitted on September 30, 1976.

10. Briefs were received from both parties and from amici curiae-Monroe Chamber of Commerce and the Monroe Charter Commission. Additionally, the City officials submitted a plan of government it would endorse if the existing scheme were found unconstitutional. Plaintiffs strongly objected to the proposed plan of government.

11. However, on March 30, 1977, this Court having been notified of a hearing fixed for June, 1977, before the United States Fifth Circuit Court of Appeals for argument of the appeal of the *Blacks United, etc. v. City of Shreveport, supra,* decision and another case of similar nature involving Mobile, Alabama, entering a ruling staying all action in this matter pending final decision by the Appellate Court on the Shreveport case.

12. This case was again restored to active status by minute entry on July 19, 1978, after disposition of the following cases by the Fifth Circuit: *Nevett v. Sides,* 571 F.2d 209 (5th Cir. 1978); *Bolden v. City of*

*Mobile,* 571 F.2d 238 (5th Cir. 1978); *Blacks United, etc. v. City of Shreveport, supra; Thomasville Branch of NAACP v. Thomas County,* 571 F.2d 257 (5th Cir. 1978).

13. On August 9, 1978, this Court issued its ruling, finding the at-large election scheme under the Monroe Commission Council form of government unconstitutionally diluted the votes of the black citizens, thereby denying them of any meaningful access to the voting process. Appropriate remedial relief was ordered commenced.

## B. GENERAL FACTS:

14. 1970 Census figures revealed there were 56,374 persons residing in the City of Monroe. Of that number, 21,540 (38.2%) of the population was black. (See Exhibit P–5).

15. Approximately 30% of the registered voters in the City of Monroe are black. (See Exhibit P–7).

16. The black population of the City of Monroe is concentrated primarily in two areas—the central or heart of the City and the Bernstein Park area on the southside of the City. Both areas are easily identifiable as being almost totally black.

17. The entirety of the City is clearly residentially segregated. The 1970 Census figures revealed that over 87% of all blacks lived in Census tracts that were at least 85% black populated. In the three Census tracts comprising nearly the entire northern part of the City (Census tracts 1, 2, and 17) the area is almost entirely white—12,777 whites and 21 blacks or 99.8% whites. (See 1970 Census tract information, Exhibit P–5 and testimony, R. Miles, pp. 130–137).

18. Further, blacks generally reside in much poorer quality housing, earn substantially less money and are generally located at the bottom of the socio-economic scale in the City. For example, Census information shows that in 1970, there were 1,594 rental units lacking some or all basic plumbing facilities. 91.7% of these units were occupied by blacks. (See Exhibit P–5, Table H–1). Black housing almost totally is located on inferior streets, with very poor drainage.

## C. CITY GOVERNMENT:

19. The City of Monroe is governed by a three-man commission council. The Mayor serves as Ex-Officio Commissioner of Public Health and Safety. There also are Commissioners of Finance and Commissioner of Streets. This form of government was adopted pursuant to an election held in 1918. The City is now generally operating pursuant to the statutory form described in L.R.S. 33:501 et seq.

20. The three members of the Council are required to qualify and be elected on an at-large basis. L.R.S. 33:522.

21. Each candidate is also required to announce his candidacy for either Mayor or as one of the Commissioners of a particular department. L.R.S. 33:504.

22. There is no requirement that candidates for any of the three offices live in any particular part of the City.

## D. "PRIMARY" FACTOR—ACCESS TO POLITICAL PROCESSES:

23. The City of Monroe is located in Ouachita Parish. It is the parish seat and the major portion of the population of the parish resides in the City. The "long history of segregation and voter registration discrimination" has already been well documented and found by this Court and the United States Fifth Circuit Court of Appeals to be second class. *Turner v. McKeithen,* 490 F.2d 191 (5th Cir. 1973); *Carroll v. Monroe City School Board,* 483 F.2d 1403 (5th Cir. 1973); *Sharp v. Lucky,* 266 F.2d 342 (5th Cir. 1959); *Reddix v. Lucky,* 252 F.2d 930 (5th Cir. 1958). Again, we find, as did the Fifth Circuit just one year prior to filing of this case:

Open, flagrant, unsophisticated, purposeful discrimination against blacks has been the long time pattern in Ouachita Parish.

*Turner v. McKeithen, supra,* at 194.

24. The panorama of discrimination has included the maintenance of dual school systems, dual recreational facilities, providing of legal and practical obstructions to

prevent blacks from registering and voting, necessitating the ordering of federal registrars to register blacks who seemingly could not otherwise be registered and unlawful purges of blacks from the voting roles of all black registrants by so-called "citizen's council" groups.

25. It is stipulated that at least since reconstruction, no black has been elected to any position in City government in the City of Monroe. However, a substantial number of well-qualified candidates have run for various offices. The election returns strikingly demonstrate that all viable black candidates were defeated as the result of extremely racially polarized voting by voters of both races. (See Exhibits P–7–15).

26. In 1972, Mr. Richard O. Miles, the present black Assistant Superintendent of the Monroe City School System, ran for Commissioner of Streets. Mr. Miles testified in this case and has testified before this Court in other cases. Despite the fact that he is quite well educated, articulate, and would be expected (absent race considerations) to be an attractive candidate, he was overwhelmingly defeated as the result of racially polarized voting. At those large precincts that were all or nearly all white, his white opponents received as much as 99.4% of the votes and in nearly all of them received at least 98% of the votes. (See Exhibit P–8).

27. In April, 1972, Rev. John L. Russell, a black, ran for Commissioner of Finance. Rev. Russell was also a school teacher, well educated, articulate and would be expected to receive a respectable percentage of the votes. Again, the returns showed that in the white precincts his white opponents received as much as 99.5% of the vote. (See Exhibit P–9).

28. However, both Miles and Russell managed to reach the second primary as the result of the large number of white candidates. In the second primary, both were soundly defeated as a result of the same type of racially polarized voting described above. (See Exhibits P–10 and 11).

29. Similar fates befell other black candidates as a result of the polarized voting.

In 1976, Dr. Henry Carroll was unable to alter the results even with a well financed campaign and enjoying endorsement by local media. (See Exhibits P–14, 15).

30. The racial polarization of Monroe's electorate, when combined with the at-large election of City Commissioners, clearly makes impossible the chances of any black citizen being elected, in the foreseeable future, thereby denying equal access to the candidate selection process.

31. Again, as was found by the Fifth Circuit in *Turner v. McKeithen, supra,* at 195, ". . . despite recent progress, the inhibiting effects of such blatant and pervasive discrimination have not yet been erased." We find that the prior history of discrimination in the registration processes and in the official acts of the City of Monroe sustain a present invidious discriminatory effect upon the black citizens therein, thereby foreclosing "meaningful access to political processes" in the government of said City.

E. "PRIMARY" FACTOR—"RESPONSIVENESS" OF ELECTED REPRESENTATIVES:

32. In 1974, there were 929 persons employed by the City of Monroe. Of this total, approximately 40% were black. However, 91.2% of all black employees earned less than $6,000.00 yearly. Only 34.4% of the whites earned less than $6,000.00. Further, 86.6% of blacks were classified at the lowest level (service/maintenance) while less than 30% of the whites were so classified. At the other end of the spectrum, 31% of all the white employees earned more than $7,900.00 while only 1.3% of the black employees earned more than $7,900.00. Additionally, the 1975 figures showed that the position of white employees was continuing to improve financially at a much faster pace than black employees. (See Exhibit P–16, 17).

33. Prior to filing of this lawsuit, the appointment of blacks to various city committees were so few that they could not be considered any more than token representa-

tion on those committees with any meaningful substantive responsibilities.

34. There exists in the City of Monroe 6.8 miles of unpaved "streets". Of that, 4.5 miles are located in black neighborhoods. The other 2.3 miles are located in commercial areas. There are no unpaved "streets" in white neighborhoods. (Testimony Bell, p. 13.)

35. Furthermore, there exists approximately 15 miles of unpaved "alleys". There is no real difference between "alleys" and "streets" in the black neighborhoods. Those alleys are used as basic transportation routes, with houses fronting on them, but remaining unpaved. The unpaved alleys in the white neighborhoods are for garbage collection purposes located at the rear of the houses. (Testimony Bell, pp. 17–18, 29–30, 37).

36. Maps located in the engineering department of the City of Monroe, were found to contain racially derogatory drawings when indicating black neighborhoods and housing projects occupied by blacks. (See Exhibit P–22).

37. Though the City has attempted to show its "responsiveness" to the particularized needs of the black citizens in the City, it is clear that nearly all of the funds expended on the projects held up as examples, were 100% federally funded and, of necessity, had to be spent in certain blighted areas which had minority representation, all pursuant to federal regulations. (Wilcox testimony, pp. 70, 74).

38. The City of Monroe also has 1226 units of public housing. Of these, 526 were built from 1950–53 and 700 were built in 1970–72. The 526 units were built on a segregated basis and occupied as such until federal authorities ordered their integration. The 700 units built in 1970–72 are inhabited by virtually all blacks and were located by the City in the very midst of a blighted and totally black neighborhood. (No public housing has been built in white neighborhoods since the elimination of segregation.) (Wilcox testimony, pp. 56–58, 76).

39. The City constructed four recreation centers in 1962. Two were located in white areas and two in black areas. All recreation facilities and the centers remained segregated, by race, in accord with official city policy until around 1969–70. (Neal testimony, pp. 94, 107).

40. Though there were adequate facilities with complete bathroom accommodations provided for whites, there were no softball or baseball fields, with bathroom facilities, that were used by blacks prior to the fall of 1975. Additionally, the facilities used by whites enjoyed concession stands, public announcement facilities and other accommodations that were not provided for the parks and areas used by blacks. When the whites did obtain a better and new facility, (1972) the recreation department head stated that, indeed, the previously used facility "was turned over to the blacks". However, other facilities were not provided the blacks, because they "just felt like that it is something that would be torn up" if placed in the black areas. (Neal testimony, pp. 98–99, 119).

41. Further, in order to maintain segregation of the Monroe "Little League", a semi-private organization was founded but the City operates the program for them. That league is operated separately from the City's league and there are no blacks participating in the white league. (Neal testimony, pp. 101–103). These dual leagues, formed to avoid integration, were, in fact, in operation at the time of the trial.

42. Further, we had the benefit of direct testimony from a former Mayor and a former black assistant to the Mayor which detailed for us the day-to-day nuances of the system which indicated the overwhelming lack of responsiveness of City government under the present election scheme. The former black assistant had ended up leaving his position in a state of disgust over his inability to trigger any responsiveness within the City government structure to the particularized needs of the black community. (Testimony of Ralph Troy and John L. Russell)

43. As concerns drainage, it was made clear that the City of Monroe as a whole has various and sundry drainage problems. We find no clear indicia of discrimination as concerns the drainage master plan *per se.* However, when there are flooded circumstances or conditions, relief· immediately provided ordinarily is dispatched to the white section of town first.

44. In considering all of the testimony and evidence, as a whole, we find a lack of responsiveness by the City government to the particularized needs of the black community.

## F. WEIGHT OF STATE POLICY REGARDING AT–LARGE ELECTION:

45. Considering the structure of the Commission Council form of government with the particularized departmental responsibilities accorded each officer, we cannot find a tenuous state interest in maintaining the at-large election system under this form of government. We do find that prior to 1918 when the City opted to choose the Commission Council form of government, Council members were elected from electoral districts. However, the at-large plan has been maintained in existence (along with the particular form of government) with at least a part of the apparent purpose being to debase and minimize black political power.

## G. "PRIMARY" FACTORS—EFFECTS OF PAST DISCRIMINATION:

46. Past racial discrimination in Ouachita Parish and in the City of Monroe has previously been found in findings twenty-three (23) through forty-two (42), *supra.* The Fifth Circuit recognized in the year prior to the filing of this suit and we now recognize and find that "the inhibiting effects" of this past discrimination have not yet been erased and directly assists in preventing any effective participation of blacks in the at-large election system presently in effect.

## H. "ENHANCING" FACTORS:

47. The electoral district is large, encompassing the entire City of Monroe, the largest city in northeast Louisiana and one of the largest in Louisiana.

48. Candidates are required to be elected by a majority vote. L.R.S. 18:358.

49. There is no anti-single shot voting restriction. However, candidates are required to run for positions by place. L.R.S. 33:504.

50. There exists no requirement that candidates for any of the offices reside in any particular part of the City.

## I. "AGGREGATE" CONCLUSIONS—INTENT:

51. The commission form of government and thus, the at-large election scheme, were adopted sixty years ago in 1918. At that time, blacks were disenfranchised and could not vote. Accordingly, we do not find purposeful discrimination to exist at the time of the 1918 election and the adoption of the at-large election scheme.

52. However, we do find, considering all of the history and evidence adduced, that the at-large election scheme and indeed, the Commission form of government, have been maintained and used for the purpose of limiting and minimizing any effective black input into the conduct of Monroe City government. The polarized voting previously found and the lack of responsiveness previously discussed provide ample support for the present findings of purposeful racial discrimination in the maintenance of said plan.

53. The at-large election structure as implemented and maintained in the City of Monroe, overwhelms and dilutes the black vote of the citizens therein in violation of their Fourteenth and Fifteenth Amendment rights.

## II.

## CONCLUSIONS OF LAW

1. This action involves claims of qualitative malapportionment, being an attack by

black citizens upon a municipal at-large election scheme. As such, the controlling precepts and criteria for evaluating the evidence have been established in *Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978); *Bolden v. City of Mobile*, 571 F.2d 238 (5th Cir. 1978); *Blacks United, etc. v. City of Shreveport*, 571 F.2d 248 (5th Cir. 1978); *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd on other grounds sub nom. East Carroll v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). There are two categories of criteria to be considered—"primary" and "enhancing". "Primary" criteria include: "the group's accessibility to political processes . . . ; the responsiveness of representatives to the 'particularized interests' of the group, the weight of the state policy behind at-large districting, and the effect of past discrimination upon the group's participation in the election system." *Nevett v. Sides, supra* at 217; *Zimmer v. McKeithen, supra* at 1305.

2. Those criteria labeled as "enhancing" include: "the size of the district; the portion of the vote necessary for election (majority or plurality); where the positions are not contested for individually, the number of candidates for which an elector must vote; and whether a candidate must reside in subdistricts." *Nevett v. Sides, supra* at 217.

■ 3. Additionally, in order for Plaintiffs to satisfy their burden of proof, discriminatory intent or purpose must be shown either in the enactment or *continued maintenance* of the election scheme under attack. However, upon finding racially discriminatory dilution under the above-enumerated criteria, there necessarily arises strong "inference" of discriminatory intent. *Nevett v. Sides, supra* at 217. The mere fact that a scheme was enacted devoid of discriminatory intent or purpose does not insulate it from subsequent attack. If it becomes a vehicle for perpetuating past discrimination, it is then rendered unconstitutional and the intent requirement will be deemed satisfied. *Nevett v. Sides, supra* at 221; *Kirksey v. Board of Supervisors*, 554 F.2d 139 (5th Cir. 1977).

■ 4. Further, upon a satisfactory showing of bloc (racially polarized) voting *and* a further satisfactory showing of "unresponsiveness" of the governing body, such will be deemed "strongly corroborative of an intentional exploitation of the electorate's bias." *Nevett v. Sides, supra* at 223.

5. The Plaintiffs need not prevail on each of the criteria in order to satisfy their burden. Rather, it is this Court's duty, as fact finder, to consider the facts of each case against the back-drop of "a blend of history and an intensely local appraisal of the design and impact of the (at-large) district in the light of past and present reality, political and otherwise." *White v. Regester*, 412 U.S. 755, 769–70, 93 S.Ct. 2332, 2341, 37 L.Ed.2d 314 (1973); *Nevett v. Sides, supra* at 224.

■ 6. Having carefully considered all of the evidence and reached our findings as concerns the various "primary" and "enhancing" criteria (hereby reiterated by reference to the appropriate findings of fact) and having weighed the competing factors, we conclude that the present Commission Council, at-large form of government in the City of Monroe violates the constitutional rights of plaintiffs under Fourteenth and Fifteenth Amendments of the United States Constitution. This election scheme impermissibly dilutes the voting impact of the black voters and provides a blockade to their effective entry into the political process.

7. Though finding no particular racial motivation when the form of government and at-large scheme were adopted in 1918, the system has been maintained and used, at least in substantial part, for the constitutionally impermissible purpose of limiting and restraining the effectiveness and impact upon black voters of the City of Monroe.

■ 8. This action has been properly prosecuted before us as a class action, and the Plaintiffs are recognized as properly representing the class they purport to represent, i. e., the black citizens and voters of the City of Monroe, all in accordance with

**468**

Rule 23 of the Federal Rules of Civil Procedure.

9. Further, finding it proper and in the interests of all parties concerned, (and in the absence of any statement by the parties that other testimony or evidence would be needed), we hereby exercise our discretion to consolidate the hearings held on August 30–31, 1976 and all other evidence submitted and adduced therewith, as a hearing, with the trial on the merits of this case and these findings shall be applicable to the merits of this matter all in accord with Rule 65(a)(2) of the Federal Rules of Civil Procedure.

10. As concerns relief, we deem it just and proper to allow the City of Monroe essentially to follow State law procedures, to the extent possible, for changing its form of government in such manner as to eliminate its unconstitutional aspects. In accordance therewith, we previously ordered the existing City Council and its present members to appoint a Bi-Racial Committee of qualified electors, within ten (10) days, to serve as a special charter commission and, with the least possible delay, to prepare and submit to the Council a new charter for the purposes of said Council calling a referendum thereon at the earliest possible date. The Council shall be provided with a copy of the charter of the City of Shreveport, Louisiana, which was adopted by its electorate on May 13, 1978, and it is strongly recommended that said Charter be considered by the City Council and the Bi-Racial Committee to be appointed insofar as it deems such possible.

11. Good faith adherence to the relief ordered is expected and required. These findings of fact and conclusions of law are supplementary to the ruling of this Court on August 9, 1978, which shall be the date for commencement of all delays provided for herein as concerns relief.